**IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION**

SUZLON WIND ENERGY             §
CORPORATION, *et al.*,          §
                               §
              Plaintiffs,      §
                               §
v.                             §        CIVIL ACTION NO. H-07-155
                               §
SHIPPERS STEVEDORING COMPANY,  §
*et al.*,                       §
                               §
              Defendants.      §

**MEMORANDUM AND OPINION**

This suit arises from a fire that damaged a portion of a wind turbine generator known

as a nacelle.  The generator, including the nacelle, was manufactured in India and shipped

to the Port of Houston for inland shipment to Minnesota.  The fire occurred after the nacelle

had been unloaded from the ship and was undergoing preparations for transportation on a

truck trailer.  Those preparations included welding necessary to secure the nacelle to the

trailer.  Suzlon Energy Ltd. ("Suzlon Energy") is a developer and manufacturer of wind

turbines based in India.  Suzlon Wind Energy Corporation ("Suzlon Wind") is the American

distributor of Suzlon Energy wind equipment headquartered in Chicago, Illinois.  The

plaintiffs, Suzlon Wind and its insurer, Codan Forsikring A/S ("Codan"), sued the following

defendants: 1). Shippers Stevedoring Company ("Shippers"), the stevedoring company that

provided the welding services; 2). ATS Wind Energy Services, a Division of Anderson

Trucking Services ("ATS"), which contracted with Suzlon Wind to handle the inland

transportation of he nacelle to its ultimate destination in Minnesota; and 3). Fitzley, Inc.

("Fitzley"), which was hired by ATS to provide drivers, trucks, and trailers to use in transporting the nacelle.

Suzlon Wind and Codan asserted claims for damages from negligence in the process of preparing the nacelle for inland transportation.  The day after Suzlon Wind filed suit, Shippers filed a declaratory judgment action against Suzlon Wind and Suzlon Energy, the Indian manufacturer, seeking to eliminate or limit liability for the fire damage to the nacelle. The two suits were consolidated.  (Docket Entry No. 4).

ATS and Fitzley filed a third-party complaint against Andrews Boom Repair, Inc. ("ABR"), which was hired by Shippers to do the welding, and ABR employee Pablo Pineiro, the welder, seeking indemnification or contribution.  (Docket Entry No. 50).  Suzlon Wind and Codan cross-claimed against ABR and Pineiro for the damage to the nacelle.  (Docket Entry No. 52).

The following motions are pending:

- Suzlon Energy has moved to dismiss for lack of personal jurisdiction, (Docket Entry No. 19), and has supplemented its motion, (Docket Entry No. 30). Shippers has responded, (Docket Entry No. 32), and Suzlon Energy has replied, (Docket Entry No. 34).

- Suzlon Wind and Codan have moved for partial summary judgment, (Docket Entry No. 33), and have supplemented the motion, (Docket Entry No. 47). Shippers, ATS, and Fitzley have responded, (Docket Entry Nos. 36, 37, 38), and Shippers has supplemented its response with objections to Suzlon Wind's summary judgment evidence, (Docket Entry No. 40).

- Shippers and ATS have moved for a continuance to conduct discovery before responding to Suzlon's partial summary judgment motion.  (Docket Entry Nos. 35, 36).   Suzlon Wind and Codan have responded to both motions for continuance.  (Docket Entry No. 41, 42).

- ABR and Pineiro have moved to dismiss ATS and Fitzley's third-party complaint or, in the alternative, for summary judgment on ATS and Fitzley's claims for indemnity and contribution.  (Docket Entry No. 62).  ATS and Fitzley have responded, (Docket Entry Nos. 64, 67), and ABR and Pineiro have replied.  (Docket Entry No. 75).

Based on the motions, responses, and replies; the parties' submissions; and the applicable law, this court

- denies Suzlon Energy's motion to dismiss for lack of personal jurisdiction;

- grants the motion for partial summary judgment filed by Suzlon Wind and Codan;

- denies the motion for continuance filed by Shippers and ATS; and

- grants in part and denies in part the summary judgment motion filed by ABR and Pineiro on ATS's and Fitzley's indemnity and contribution claims, making the motion to dismiss moot.

The reasons for these rulings are set out below.

## I.    Background

### A.    The Evidence as to Personal Jurisdiction over Suzlon Energy

The parties took discovery relating to the jurisdiction of this Texas court over Suzlon Energy, an Indian company headquartered in Mumbai, India.  Ken Glazier, Suzlon Wind's corporate representative, testified about Suzlon Energy's jurisdictional contacts with Texas and the corporate relationship between Suzlon Energy and Suzlon Wind.

Suzlon Energy designs, manufactures, sells, and services wind turbine generators in India and arranges with other entities to sell and service the wind turbine generators in other parts of the world.   Suzlon Energy formed Suzlon Wind in October 2001 to sell Suzlon Energy's wind generators in the United States.  Suzlon Wind was initially incorporated as a wholly owned subsidiary of Suzlon Energy.  The first office of Suzlon Wind was in Houston, Texas and was set up to study the United States market for wind generators. During 2001–2002, Suzlon Energy sent employees to Texas to consult with and train Suzlon Wind employees and to work on developing the United States market.  Suzlon Wind is presently the wholly owned subsidiary of Suzlon Energy A/S, a Danish corporation, which is a wholly owned subsidiary of Suzlon Energy.  Suzlon Wind is incorporated under the law of Delaware and has its headquarters in Chicago, Illinois.

Suzlon Wind is the only United States distributor of Suzlon Energy wind turbine generators.  Suzlon Wind typically sells generators to customers in the United States under a "frame agreement" between Suzlon Wind and its customer.  This agreement in turn leads to a "notice to proceed," which serves as an order from Suzlon Wind's customer to deliver a wind generator to the site.  Suzlon Wind orders generators from Suzlon Energy once frame agreements are in place.  Suzlon Energy is not a party to the frame agreement between Suzlon Wind and its United States customers.  Suzlon Energy sells generators to Suzlon

Wind with a two-year warranty.  Suzlon Wind offers a two-year warranty to its customers in the United States, with the option of purchasing an extended warranty of up to five years.

Suzlon Energy contracts with an ocean carrier to ship to the United States the generators it is selling to Suzlon Wind.  Eighty percent of all Suzlon Energy generators sold in the United States are shipped through the Port of Houston; the rest generally pass through Freeport, Texas or Baltimore, Maryland.  Suzlon Energy sends the bills of lading to Suzlon Wind in Chicago.  The generators are sold "CFR," signifying that the seller, Suzlon Energy, pays for the cost of freight to the delivery port, where title and the risk of loss transfer to the buyer, Suzlon Wind.  There are seventy-five wind generators currently installed in Texas, in Hansford and Sherman Counties, and thirty more under contract.

Suzlon Energy does not have an office in Texas, is not authorized to do business in Texas, does not have an agent for service of process in Texas, has not signed contracts in Texas, does not own real property in Texas, and does not have employees permanently based in Texas.  Suzlon Energy periodically sends technical support representatives from India to the United States, including Hansford County, Texas, to assist with problems with the wind generator turbines.  Although Suzlon Energy has no employees permanently working in the United States, its technical representatives travel to and work in the United States for periods ranging from two weeks to a month.  Suzlon Energy prepared the advertising and marketing brochures that Suzlon Wind uses for its customers. Suzlon Energy also provides technical training for Suzlon Wind technicians in the United States through tapes and technical manuals and other materials.

Suzlon Energy and Suzlon Wind maintain corporate formalities.  None of Suzlon Wind's officers is an officer of Suzlon Energy.  Two of Suzlon Wind's directors are officers of Suzlon Energy, but none of Suzlon Wind's directors is a director of Suzlon Energy.  The companies have separate headquarters and do not maintain common business departments.  Suzlon Wind and Suzlon Energy have separate accounting and Suzlon Wind files a separate United States federal income tax return.  There is no suggestion that Suzlon Wind is undercapitalized or that its employees are paid by Suzlon Energy.  Indeed, although Suzlon Energy initially provided intercorporate loans to Suzlon Wind, the evidence shows that Suzlon Wind generates its own revenue by selling wind generators and related equipment to United States customers and has not received any money from Suzlon Energy in the past two years.  The evidence shows that Suzlon Energy did not control or direct the operations of Suzlon Wind.

**B.     The Evidence as to the Shipment and Fire**

The nacelle at issue was shipped by Suzlon Energy to Suzlon Wind as part of a cargo of wind energy equipment in November 2005.  The cargo, including four nacelles, was shipped from Mumbai, India to the Port of Houston on board the M/V Saudi Hofuf under bill of lading HF126BMHO-058.  The nacelle was discharged on November 18, 2005 at the Barbours Cut Terminal in the Port of Houston, Texas at a site operated by Shippers.  Suzlon Wind retained ATS to handle the inland transportation of the cargo from the Port of Houston to its ultimate destination in Minnesota.  ATS hired drivers, trucks, and trailers from Fitzley for the transportation.

ATS learned that under applicable United States Department of Transportation regulations, transportation on the Fitzley trailers required additional support points for tie-downs in the nacelle shipping stands.  ATS consulted with Suzlon Wind about these additional support points and where they would be located on the shipping stands.  Suzlon Wind asked its agent, Project Logistics International, Inc. ("PLI"), to arrange for the welding needed to incorporate the additional support points.  PLI retained Shippers to perform the welding.  Shippers in turn hired Andrews Boom Repair.

On January 18, 2006, the nacelle was loaded onto a Fitzley trailer.  Pablo Pineiro, who worked for Andrews Boom Repair, was performing the welding when fire broke out in the nacelle.  Suzlon Wind asserts that the damage to the nacelle was $848,502.27.  Suzlon Wind sued Shippers, ATS, and Finley to recover the damages, alleging negligence.  Shippers seeks a declaratory judgment that it has no or limited liability for the damages from the fire.  ATS and Fitzley filed a third-party complaint against ABR and Pineiro, seeking indemnification or contribution; Suzlon Wind and Codan cross-claimed against ABR and Pineiro.  (Docket Entry No. 50, 52).

### C.    The Pending Motions

Suzlon Energy has moved to dismiss the claims against it for lack of personal jurisdiction.  Suzlon Energy asserts that it does not have the requisite minimum Texas contacts to support specific or general jurisdiction and that Suzlon Wind is not an alter ego that would allow its contacts to be imputed to Suzlon Energy.

Suzlon Wind and Codan have moved for partial summary judgment on the issue of whether Shippers, Fitzley, and ATS may rely on the terms, conditions, limitations, or

defenses contained in the bill of lading for the nacelle's ocean transport.  Suzlon Wind and Codan argue that the bill of lading is an "ocean" or "port-to-port" bill of lading that covered only ocean transportation from Mumbai, India to Houston, Texas and that the bill of lading did not extend the liability limitations of the Carriage of Goods by Sea Act ("COGSA"), 46 U.S.C. § 1301 *et seq.*, beyond the discharge of the nacelle from the ship to its inland transportation.  Shippers, Fitzley, and ATS argue that fact issues exist as to whether the bill of lading was a port-to-port bill of lading or a through bill of lading covering transportation from Mumbai to the ultimate destination of Murray County, Minnesota; whether the bill of lading extends COGSA's liability limitation beyond its statutory "tackle to tackle" coverage period; and whether delivery had already occurred under the bill of lading when the fire broke out.

ABR and Pineiro have moved to dismiss ATS and Fitzley's claim for indemnity on the grounds that: no contractual relationship existed between ABR and either ATS or Fitzley; Texas no longer recognizes a common-law claim for indemnity; and general maritime law does not authorize an action for tort indemnity against a third-party defendant for property damage.  ABR and Pineiro have also moved to dismiss ATS and Fitzley's claim for contribution on the ground that such a claim is premature because no court has yet adjudicated liability.  ATS and Fitzley argue that a finding of liability is not necessary to file a third-party contribution claim under Federal Rule of Civil Procedure 14(a).  ATS and Fitzley contend that the bill of lading contains an indemnity provision that allows ATS and Fitzley to seek indemnification against ABR and Pineiro.

These arguments are examined below.

**II.     Personal Jurisdiction Over Suzlon Energy**

**A.     The Legal Standard**

A federal court may exercise personal jurisdiction over a nonresident defendant if (1) the long-arm statute of the forum state confers personal jurisdiction over that defendant and (2) the exercise of such jurisdiction comports with due process under the U.S. Constitution. *See Electrosource, Inc. v. Horizon Battery Techs., Ltd.*, 176 F.3d 867, 871 (5th Cir. 1999). Because the Texas long-arm statute has been interpreted to extend as far as due process permits, the sole inquiry is whether the exercise of personal jurisdiction over a nonresident defendant comports with federal constitutional due process requirements. *Religious Tech. Ctr. v. Liebreich*, 339 F.3d 369, 373 (5th Cir. 2003); TEX. CIV. PRAC. & REM. CODE §§ 17.041–17.045.

The due process inquiry focuses on whether the nonresident defendant has "certain minimum contacts with [the forum] such that the maintenance of the suit does not offend 'traditional notions of fair play and substantial justice.'" *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945). "A defendant establishes minimum contacts with a state if 'the defendant's conduct and connection with the forum state are such that [the defendant] should reasonably anticipate being haled into court there.'" *Nuovo Pignone, SpA v. Storman Asia M/V*, 310 F.3d 374, 379 (5th Cir. 2002) (quoting *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 474 (1985)). "There must be some act whereby the [nonresident] defendant 'purposefully avails itself of the privilege of conducting activities within the forum state, thus invoking the benefits and protections of its laws.'" *Id.*

A plaintiff bears the burden of demonstrating facts sufficient to support personal jurisdiction over a nonresident defendant.  That burden is met by a *prima facie* showing; proof by a preponderance of the evidence is not necessary.  *Revell v. Lidov*, 317 F.3d 467, 469 (5th Cir. 2002); *Alpine View Co. Ltd. v. Atlas Copco AB*, 205 F.3d 208, 215 (5th Cir. 2000).  The court may determine the jurisdictional issue by receiving "affidavits, interrogatories, depositions, oral testimony, or any combination of the recognized methods of discovery."  *Revell*, 317 F.3d at 469.  "[O]n a motion to dismiss for lack of jurisdiction, uncontroverted allegations in the plaintiff's complaint must be taken as true, and conflicts between the facts contained in the parties' affidavits must be resolved in the plaintiff's favor."  *D.J. Invs. v. Metzeler Motorcycle Tire Agent Gregg, Inc.*, 754 F.2d 542, 546 (5th Cir. 1985) (citing *Brown v. Flowers Indus., Inc.*, 688 F.2d 328, 332 (5th Cir. 1982)).  However, the court is not obligated to credit conclusory allegations, even if uncontroverted.  *Panda Brandywine Corp. v. Potomac Elec. Power*, 253 F.3d 865, 869 (5th Cir. 2001).  The "plaintiff's *prima facie* showing, necessary to defeat a jurisdiction testing motion, must include an averment of facts that, if credited by [the ultimate trier of fact], would suffice to establish jurisdiction over the defendant."  *Metro. Life Ins. Co. v. Robertson-Ceco Corp.*, 84 F.3d 560, 567 (2d Cir. 1996); *Hartford Fire Ins. Co. v. Hutchinson*, No. 05-cv-2078, 2006 WL 903715, at *2 (S.D. Tex. Apr. 6, 2006) ("A plaintiff may present a *prima facie* case by producing admissible evidence which, if believed, would suffice to establish the existence of personal jurisdiction.").

Minimum contacts can be established through "contacts that give rise to 'specific' personal jurisdiction and those that give rise to 'general' personal jurisdiction."  *Wilson v.*

*Belin*, 20 F.3d 644, 647 (5th Cir. 1994).  A court may exercise specific jurisdiction when: (1) the nonresident defendant purposely availed itself of the privileges of conducting activities in the forum state; and (2) the controversy arises out of or is related to the defendant's contacts with the forum state.  *Freudensprung v. Offshore Tech. Serv.*, 379 F.3d 327 (5th Cir. 2004) (citations omitted); *Liebreich*, 339 F.3d at 375; *Quick Techs., Inc. v. Sage Group PLC*, 313 F.3d 338, 344 (5th Cir. 2002); *Gundle Lining Constr. Corp. v. Adams County Asphalt, Inc.*, 85 F.3d 201, 205 (5th Cir. 1996) (citing *Helicopteros Nacionales de Colombia, S.A. v. Hall*, 446 U.S. 408, 414 n.8 (1984)).  To determine whether specific jurisdiction exists, a court must "examine the relationship among the defendant, the forum, and the litigation to determine whether maintaining the suit offends traditional notions of fair play and substantial justice."  *Gundle Lining Constr.*, 85 F.3d at 205.  "The nonresident's 'purposeful availment' must be such that the defendant 'should reasonably anticipate being haled into court' in the forum state."  *Ruston Gas Turbines, Inc. v. Donaldson Co.*, 9 F.3d 415, 419 (5th Cir. 1993) (citing *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 297 (1980)).

When the cause of action does not arise from or relate to the foreign defendant's purposeful conduct within the forum state, due process requires that the foreign defendant have engaged in continuous and systematic contacts with the forum state before a court may exercise general personal jurisdiction.  *Helicopteros*, 466 U.S. at 414–15; *Bearry v. Beech Aircraft Corp.*, 818 F.2d 370, 374 (5th Cir. 1987).  The plaintiff must demonstrate contacts of a more extensive quality and nature between the forum state and the defendant than those needed to support specific jurisdiction.  *Dalton v. R & W Marine*, 897 F.2d 1359, 1362 (5th

Cir. 1990) (citations omitted).  "To exercise general jurisdiction, the court must determine whether 'the contacts are sufficiently systematic and continuous to support a reasonable exercise of jurisdiction.'"  *Holt Oil & Gas v. Harvey*, 801 F.2d 773, 777 (5th Cir. 1986) (quoting *Stuart v. Spademan*, 772 F.2d 1185, 1191 (5th Cir. 1985)); *see also Freudensprung*, 379 F.3d at 343.

### B.    Personal Jurisdiction Based on the Contacts of Suzlon Wind

The evidence shows no basis to assert personal jurisdiction over Suzlon Energy by imputing the Texas contacts of its indirect subsidiary, Suzlon Wind.  The evidence does not support an inference that Suzlon Wind is an alter ego of Suzlon Energy so as to impute Suzlon Wind's Texas contacts to Suzlon Energy.  The mere existence of a parent–subsidiary relationship will not support the assertion of jurisdiction over a foreign parent.  *See Dalton*, 897 F.2d at 1363; *Hargrave v. Fibreboard Corp.*, 710 F.2d 1154, 1159 (5th Cir. 1983); *see also Freudensprung*, 379 F.3d at 346.  Personal jurisdiction based on a parent–subsidiary relationship is warranted only if the parent corporation is merely the alter ego of its subsidiary, such that a court can impute to the parent its subsidiary's contacts with the forum state for the purpose of establishing jurisdiction.  *See Freudensprung*, 379 F.3d at 346.

In determining whether a plaintiff asserting personal jurisdiction "has overcome the presumption of corporate separateness," the Fifth Circuit considers the following nonexhaustive factors: (1) the amount of stock owned by the parent of the subsidiary; (2) whether the entities have separate headquarters, directors, and officers; (3) whether corporate formalities are observed; (4) whether the entities maintain separate accounting systems; and (5) whether the parent exercises complete control over the subsidiary's general policies or

daily activities. *Freudensprung*, 379 F.3d at 346 (citing *Hargrave*, 710 F.2d at 1160). Although Suzlon Wind is a wholly owned subsidiary of Suzlon Energy A/S, which is in turn a wholly owned subsidiary of Suzlon Energy, the record shows that Suzlon Wind and Suzlon Energy observe corporate separateness. Most of their directors and officers do not overlap. They have separate headquarters. Suzlon Energy did not control or direct the operations of Suzlon Wind. The corporate relationship between Suzlon Energy and Suzlon Wind does not support the exercise of personal jurisdiction over Suzlon Energy based on an alter-ego theory.

Personal jurisdiction cannot be exercised by this Texas court over Suzlon Energy on the basis that Suzlon Wind served as its "agent." Shippers cites *Chan v. Society Expeditions, Inc.*, 39 F.3d 1398, 1405 (9th Cir. 1994), to support the argument that the agency relationship between Suzlon Energy and Suzlon Wind supports the exercise of personal jurisdiction over Suzlon Energy by a Texas court. Because Suzlon Wind provides Suzlon Energy's entire marketing function in the United States, Shippers argues that Suzlon Wind provides Suzlon Energy "with services that are sufficiently important to the foreign corporation that if it did not have a representative to perform them, the corporation's own officials would undertake to perform substantially similar services." (Docket Entry No. 32 at 7). Suzlon Energy argues that Shippers's reliance on *Chan* is misplaced because the Fifth Circuit has not adopted that court's analysis of whether the alleged agent provides "sufficiently important services" to a foreign corporation. Suzlon Energy relies instead on *Product Promotions, Inc. v. Cousteau*, 495 F.2d 483 (5th Cir. 1974), and argues that in examining whether an agency relationship

exists, the Fifth Circuit considers whether the alleged agent acts with actual or apparent authority to bind the principal. (Docket Entry No. 34 at 5).

Shippers cites no Fifth Circuit cases relying on the agency analysis articulated in *Chan*. In determining whether personal jurisdiction over a foreign corporation is warranted, the Fifth Circuit examines whether a domestic corporation has authority to contract on behalf of or otherwise bind the foreign corporation if the two corporations have a contractual relationship, *see Standard Fittings Co. v. Sapag, S.A.*, 625 F.2d 630 (5th Cir. 1980), or when the corporate relationship between the two entities is unclear, *see Product Promotions*, 495 F.2d 483. When the corporate relationship between a subsidiary and parent corporation is clear, recent Fifth Circuit cases have applied the alter-ego analysis outlined above. *See, e.g.*, *Freudensprung*, 379 F.3d 327 ("[O]ur cases generally demand proof of control by one corporation over the internal business operations and affairs of another corporation to make the other its agent or alter ego, and hence fuse the two together for jurisdictional purposes" (internal punctuation and citation omitted); *Patin v. Thoroughbred Power Boat, Inc.*, 294 F.3d 640 (5th Cir. 2002) ("Although jurisdiction over a subsidiary does not automatically provide jurisdiction over a parent[,] where the parent totally controls the actions of the subsidiary so that the subsidiary is the mere alter ego of the parent, jurisdiction is appropriate over the parent as well" (citation omitted)); *Turan v. Universal Plan Invs., Ltd.*, 248 F.3d 1139, at *3 (5th Cir. 2001) (holding that "in determining whether a parent can be held amenable to personal jurisdiction because of the acts of its subsidiary . . . [g]enerally, what is required is evidence that the parent asserts such control over its subsidiary that the subsidiary is, in reality, the parent's agent or alter ego"). The corporate relationship between

Suzlon Energy and Suzlon Wind does not support the exercise of personal jurisdiction over Suzlon Energy based on an agency theory.

This court cannot assert personal jurisdiction over Suzlon Energy by imputing Suzlon Wind's Texas contacts.  The issue is whether Suzlon Energy's own contacts with the forum are sufficient.

## C.   Specific Personal Jurisdiction over Suzlon Energy Based on its Own Texas Contacts

A court may exercise specific personal jurisdiction when: (1) the nonresident defendant purposely availed itself of the privileges of conducting activities in the forum state; and (2) the controversy arises out of or is related to the defendant's contacts with the forum state.  *Freudensprung*, 379 F.3d 327.  "The nonresident's 'purposeful availment' must be such that the defendant 'should reasonably anticipate being haled into court' in the forum state."  *Ruston Gas Turbines*, 9 F.3d at 419 (citing *World-Wide Volkswagen Corp.*, 444 U.S. at 297).  The Supreme Court has "consistently rejected the notion that an absence of physical contacts can defeat personal jurisdiction" if a "commercial actor's efforts are purposefully directed toward residents of another State."  *Burger King*, 471 U.S. at 476.

Specific jurisdiction applies here because the cause of action arises in part from the design and manufacture of the nacelle Suzlon Energy shipped to Houston, Texas for transportation to the ultimate destination.  Shippers alleges that the fire was caused by a defect in the nacelle itself.  Shippers alleges that after the fire, it learned that two other Suzlon Energy wind turbine generators had recently been involved in fires that may have been due to a problem with the insulation.  One of these fires occurred in October 2005 in

Houston; the other occurred in November 2005 in Minnesota.  Suzlon Energy designed and manufactured the nacelle and shipped it to Houston, Texas.

Suzlon Energy's agreement to supply a nacelle that could be safely discharged and loaded in Texas for land transport to its ultimate destination is a sufficient forum-related contact to confer personal jurisdiction.  Suzlon Energy cannot claim that its contact with Texas merely fortuitous, random, or attenuated because Suzlon Energy contractually specified that the nacelle would be shipped to Houston, Texas to be discharged and loaded for inland transportation.  Kenneth Glazier, Vice President and Corporate Secretary of Suzlon Wind, testified in his deposition that Suzlon Energy's wind turbine generator shipments to the Port of Houston represent fifteen percent of Suzlon Energy's 2006 shipments worldwide and eighty percent of its shipments to the United States..  (Docket Entry No. 30, Ex. 1 at 33–35).  Suzlon Energy also ships generators to Freeport, Texas.  (*Id.*, Ex. 1 at 25).  Suzlon Energy consults with Suzlon Wind on choosing the port of delivery but it is Suzlon Energy that makes the shipping arrangements.  (*Id.*, Ex. 1 at 33).  It was Suzlon Energy that specified Texas as the point where this generator, along with eighty percent of all the generators shipped to the United States, would arrive, be discharged, and loaded on trucks for inland transportation to the ultimate destination.  This case has similarities to *Nuovo Pignone, SpA v. Storman Asia M/V et al.*, 310 F.3d 374, 380 (5th Cir. 2002).  In *Nuovo Pignone*, the Italian carrier's agreement to supply a vessel that was equipped to allow for safe discharge of the cargo in Louisiana was sufficient to confer specific personal jurisdiction over the carrier in Louisiana for a claim arising out damage to the cargo during discharge.

Suzlon Energy asserts that the shipment of this nacelle to Texas cannot support personal jurisdiction because the generator became Suzlon Wind's property when it arrived in Texas.   This argument is unpersuasive.   Suzlon Energy does not dispute that it manufactured the nacelle or that it arranged for it to be shipped to Texas to satisfy an order placed by Suzlon Wind.  As in *Nuovo Pignone*, Suzlon Energy is arguing that other parties were responsible for loading the nacelle after its entry, in part because ownership of the nacelle had passed to another party, Suzlon Wind, after the nacelle entered the forum state. The fact that Suzlon Energy contracted to ship the generator to Suzlon Wind CFR is not determinative.   As the court noted in *Nuovo Pignone*, CFR is an "incoterm" used in international sales contracts to allocate risk between buyers and sellers.  Although the risk of the nacelle's loss as between Suzlon Energy and Suzlon Wind may have shifted at the point of discharge, that does not determine whether Suzlon Energy is subject to jurisdiction in Texas for an alleged defect in the nacelle that caused or contributed to cause the fire.  The fact that other parties, including Suzlon Wind and Shippers, were responsible for loading the nacelle onto the trailer does not preclude specific jurisdiction based on the record before this court.  Nor does the fact that ownership of the nacelle had passed to another party, Suzlon Wind, before the nacelle entered Texas.  Again, *Nuovo Pignone* is instructive.  In that case, although other parties were responsible for unloading the cargo in Louisiana, the Italian shipper had contractually agreed to provide a crane that could do so safely.  In the present case, although other parties were contractually responsible for loading the nacelle, Suzlon Energy had agreed to provide a nondefective nacelle that could be safely transported after it arrived in Texas.  This court must accept Shippers's allegation that a defect in the nacelle

was the cause of the fire during the welding in Houston.  Suzlon Energy cannot avoid personal jurisdiction by speculating as to whether another party, including Shippers, was in fact responsible for the fire.  *See Nuovo Pignone,* 310 F.3d at 380.  Suzlon Energy cannot "escape personal liability by intertwining itself in a multi-layered contractual arrangement" when it was a "voluntary member of the economic chain" that brought the nacelle to Texas, where it was damaged allegedly because of a manufacturing defect.  *Id.*

Although a "nonresident may permissibly structure his primary conduct so as to avoid being haled into court in a particular state," the record shows that Suzlon Energy purposefully directed its marketing, manufacturing, and shipping activities at Texas, which serves as the gateway into the United States for over eighty percent of the Suzlon Energy products sold to United States customers.  *Nuovo Pignone*, 310 F.3d at 379 (citing *World-Wide Volkswagen*, 444 U.S. at 297 (1980)).  Suzlon Energy's sale of generators to Suzlon Wind for delivery through the Port of Houston loading onto trailers for inland transportation is not a "merely fortuitous, random, or attenuated" contact with the forum state.  *Id.* at 379.

Suzlon Energy argues that this circuit does not apply a stream-of-commerce basis for specific personal jurisdiction over nonresident defendants that send an allegedly defective product into a forum outside the strict liability context.  (Docket Entry No. 34 at 3–4).  Suzlon Energy is correct that the Fifth Circuit has not extended this basis for personal jurisdiction to contract or similar cases, in which the defendant's delivery of products is unrelated or only tangentially related to the cause of action.  *See, e.g., Nuovo Pignone*, 310 F.3d at 381 (discussing cases).  But this is not a case in which there is only an attenuated link between the litigation and the nonresident defendant's contacts with the forum state.  This

litigation arises from a fire that occurred in Texas allegedly as a result of the nonresident defendant's shipment of the allegedly defective product into Texas, where the product was intended to be loaded for inland transportation.  The defect allegedly surfaced in Texas when it caused or contributed to cause a fire during the preparation for the inland transportation. The parties seeking to subject Suzlon Energy to jurisdiction in Texas are not the party with whom Suzlon Energy contracted in Texas, but rather third parties that unloaded and loaded the nacelle when it arrived in Texas.  *See Nuovo Pignone*, 310 F.3d at 379 (upholding jurisdiction against Italian shipper that allegedly failed to provide a vessel with safe hoisting operations to unload cargo in Louisiana, resulting in cargo being dropped when it landed in Louisiana); *Gulf Consolidated  Servs., Inc. v. Corinth Pipeworks, S.A.*, 898 F.2d 1071, 1073–74 (5th Cir. 1990) (Greek distributor that sent defective oilfield casings to Texas distributor that were allegedly incorporated into pipe was subjected to personal jurisdiction in Texas because the defendant knew the casings were intended for use in Texas and could reasonably anticipate being haled into court there).

Once minimum contacts are established between a defendant and the forum state, the burden shifts to the defendant to show that the assertion of jurisdiction is unfair and unreasonable.  In making this determination, the court looks to the burden on the nonresident defendant, the interests of the forum state, the plaintiff's interest in obtaining relief, the interstate judicial system's interest in the most efficient resolution of controversies, and the shared interests of the several states in furthering fundamental social policies.  *Nuovo Pignone*, 310 F.3d at 382.  In this case, there is no unfairness to subjecting Suzlon Energy to the jurisdiction of this Texas court in a case that arises out of an alleged fire that occurred

in Texas in a nacelle that Suzlon Energy manufactured and shipped to Texas. As noted, approximately eighty percent of the wind turbine generators that Suzlon Energy ships to the United States come through Texas. There are currently seventy-five Suzlon Energy wind turbine generators installed in Texas. Thirty more generators are allocated for the Texas market under currently existing contracts. Suzlon Energy routinely sends its employees to spend extended periods in Texas training United States technicians and providing service for the generators sold and installed in Texas. Suzlon Energy presents no reason why it would be unfairly burdensome to defend a suit in Houston, Texas arising out of a nacelle that it shipped to Houston. Texas has an interest in resolving a claim arising out of the condition of the equipment that allegedly caused it to catch fire when it was being prepared for inland transport in Houston. The location of the incident affects the interests of a Texas court. The parties seeking to limit or avoid liability and to seek indemnity or contribution for any liability are Texas companies. The record shows that given the extensive involvement of Suzlon Energy in Texas to ship, sell, and provide service to its wind turbine generators, there is no basis to conclude that subjecting it to suit in Texas would be unfairly burdensome.

This conclusion is strengthened by the fact that Suzlon Energy has previously submitted to jurisdiction in a Texas court in a similar case. Shippers asserts that Suzlon Energy "actively participated in the case" and therefore "previously submitted to the *in personam* jurisdiction of this Court without argument." In that suit, which also concerned damages resulting from a fire that broke out during the transportation of a generator, Suzlon Energy advanced a defense based on the parties' forum-selection clause, but failed to assert a defense based on a lack of personal jurisdiction.

Suzlon Energy has sufficient minimum contacts with Texas to support personal jurisdiction. Suzlon Energy's motion to dismiss is denied.

## III. The Motion for Partial Summary Judgment on the Bill of Lading

### A. The Legal Standard

Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law. *See* FED. R. CIV. P. 56(c). The movant bears the burden of identifying those portions of the record it believes demonstrate the absence of a genuine issue of material fact." *Lincoln General Ins. Co. v. Reyna*, 401 F.3d (5th Cir. 2005) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986)).

If the burden of proof at trial lies with the nonmoving party, the movant may either (1) submit evidentiary documents that negate the existence of some material element of the opponent's claim or defense, or (2) if the crucial issue is one on which the opponent will bear the ultimate burden of proof at trial, demonstrate that the evidence in the record insufficiently supports an essential element or claim. *Celotex*, 477 U.S. at 330. The party moving for summary judgment must demonstrate the absence of a genuine issue of material fact, but need not negate the elements of the nonmovant's case. *Bourdeaux v. Swift Transp. Co., Inc.*, 402 F.3d 536, 540 (5th Cir. 2005). "An issue is material if its resolution could affect the outcome of the action." *DIRECTV, Inc. v. Robson*, 420 F.3d 532, 535 (5th Cir. 2005) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 251–52 (1986)). If the moving party fails to meet its initial burden, the motion for summary judgment must be denied, regardless of the nonmovant's response. *Baton Rouge Oil & Chem. Workers Union v. ExxonMobil Corp.*, 289 F.3d 373, 375 (5th Cir. 2002).

When the moving party has met its Rule 56(c) burden, the nonmoving party cannot survive a motion for summary judgment by resting on the mere allegations of its pleadings. The nonmovant must identify specific evidence in the record and articulate the manner in which that evidence supports that party's claim. *Johnson v. Deep E. Tex. Reg'l Narcotics Trafficking Task Force*, 379 F.3d 293, 305 (5th Cir. 2004). This burden is not satisfied by "some metaphysical doubt as to the material facts," "conclusory allegations," "unsubstantiated assertions," or "only a scintilla of evidence." *Young v. ExxonMobil Corp.*, 155 Fed. Appx. 798, 800 (5th Cir. 2005).

In deciding a summary judgment motion, the court draws all reasonable inferences in the light most favorable to the nonmoving party. *Anderson,* 477 U.S. at 255; *Young*, 155 Fed. Appx. at 800. "Rule 56 '*mandates* the entry of summary judgment, after adequate time for discovery, and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial.'" *Beard v. Banks*, 126 S.Ct. 2572, 2578 (2006) (quoting *Celotex*, 477 U.S. at 322).

**B.     The Bill of Lading and the Application of COGSA**

Suzlon Wind and Codan have moved for partial summary judgment on the issue of whether Shippers, Fitzley, and ATS may rely on terms, conditions, limitations, or defenses contained in the bill of lading that was issued for the ocean transportation of the generator. Bill of lading number HF126BMHO-058 provided that trades to or from the United States are subject to the Carriage of Goods by Sea Act ("COGSA"), 46 U.S.C. § 1301 *et seq.*, which allows a carrier to limit its liability for loss or damage to cargo to $500 per package

or customary freight unit unless the owner declares a higher value and pays a higher rate.

Suzlon Wind argues that the bill of lading was an ocean bill of lading covering transportation only from Mumbai to Houston, not a through bill of lading covering transportation from Mumbai to Murray County, Minnesota. Suzlon Wind also argues that the bill of lading fails to extend COGSA's coverage beyond the statutory tackle-to-tackle coverage period. Suzlon Wind contends that because COGSA does not apply, Shippers, Fitzley, and ATS can limit their liability only through the Harter Act, 46 U.S.C. § 190 *et seq.*, which defines a carrier's duties for cargo loading, stowage, custody, care, and delivery before loading or after discharge. Suzlon Wind cites *Mannesman Demag Corp. v. M/V Concert Express*, 225 F.3d 587, 593 (5th Cir. 2000), for the Fifth Circuit's definition of "delivery" under the Harter Act. Suzlon Wind argues that the nacelle's delivery had already occurred when the fire broke out and that Shippers, Fitzley, and ATS are not entitled to a limitation of liability under the Harter Act.

Shippers, Fitzley, and ATS argue that there are fact issues as to whether the bill of lading was through bill of lading or an ocean or "port-to-port" bill of lading; whether the bill of lading extends COGSA's liability limitation beyond its statutory tackle-to-tackle coverage period; and whether delivery had already occurred under the bill of lading's terms when the fire broke out. Citing *Marine Office of Am. Corp. v. NYK Lines*, 638 F. Supp. 393, 399 (N.D. Ill.), and *Coutinho, Caro & Co. v. Hyde Park Shipping, Inc.*, No. 91-3247, 1992 WL 165725, at *4 (E.D. La. July 9, 1992), Shippers, Fitzley, and ATS argue that determining whether a bill of lading is a through bill of lading is a "fact-laden inquiry" into whether the cargo's final destination is indicated on the bill, the conduct of the shipper and carriers, and whether

connecting carriers were compensated by payment made to the initial carrier or by separate consideration from the shipper.  (Docket Entry No. 37 at 2–3; Docket Entry No. 38 at 3–4).  Shippers, Fitzley, and ATS emphasize that the nacelle's ultimate destination was Murray County, Minnesota.  In addition, Shippers and Fitzley argue that the bill of lading extends COGSA's application beyond the statutory tackle-to-tackle period.

Shippers, Fitzley, and ATS also dispute that delivery had occurred before the fire started.  They argue that fact issues exist as to which party had custody or control over the nacelle at the time of the fire and whether inland transport of the nacelle had begun.  Shippers and ATS have moved for a continuance to pursue further discovery on these fact issues.  (Docket Entry Nos. 35, 36).  Shippers seeks "discovery to verify all facts asserted in [Suzlon Wind and Codan's] motion, including, but not limited to, the status of the off-loading of the nacelles at the time of the fire and the agreement(s) entered into between Suzlon USA and Co-Defendant ATS Wind Energy Services."  (Docket Entry No. 35 at 3).  ATS seeks additional time to conduct discovery on the terms of sale for the nacelle's shipment, the parties' intent as to the shipment's ultimate destination in Minnesota and any interim destinations in Houston, and whether any other bills of lading exist.  (Docket Entry No. 36 at 10).

### 1. Is the Bill of Lading a Through Bill of Lading or a Port-to-Port Bill of Lading?

Under a through bill of lading, "a cargo owner can contract for transportation across oceans and to inland destinations in a single transaction."  *Norfolk S. Ry. Co. V. Kirby*, 26 (2004); *see also Mannesman*, 225 F.3d at 588 n.3 ("A through bill of lading is one by which

an ocean carrier agrees to transport goods to their final destination.  Someone else (e.g. railroad, trucker, or air carrier) performs a portion of the contracted carriage.").  A through bill of lading "assimilate[s] land legs into international ocean bills of lading" and a shipper can arrange for transport in a single contract, "rather than to negotiate a separate contract—and to find an American [carrier] itself—for the land leg." *Kirby*, 543 U.S. at 26.

The present record does not show that Suzlon Energy or Suzlon Wind contracted for a through bill of lading covering transportation from Mumbai, India to the nacelle's ultimate destination in Murray County, Minnesota.  Rather, the record shows that Suzlon Energy and Suzlon Wind made separate arrangements for the nacelle's ocean and inland transport. Kevin Glazier testified in his deposition that Suzlon Energy arranged for the nacelle's shipment from Mumbai to Houston by the National Shipping Company of Saudi Arabia. (Docket Entry No. 30, Ex. 1 at 33–34).  Glazier stated in his affidavit that Suzlon Wind arranged for the nacelle's inland transport from Houston to Murray County by ATS. (Docket Entry No. 33, Ex. 1, ¶ 4).  The record does not show that Suzlon Energy or Suzlon Wind contracted for the shipment of the nacelle from Mumbai to Murray County in one transaction that assimilated the inland transport from Houston to Murray County into the international ocean bill of lading.

Shippers, Fitzley, and ATS argue that the bill of lading's language contemplates both "Port to Port Shipment" and "Combined Transport."  In Box 15, the bill of lading lists "Houston," not the "Port of Houston," as the "Place of Delivery."  Shippers, Fitzley, and ATS contend that "it is possible that in-land transportation to some location in Houston was agreed" and that the bill of lading was a through bill of lading that covered combined

transport.  (Docket Entry No. 30, Ex. 2A).  This argument is not persuasive.  Box 15—"Place of Delivery"—is "applicable only when [the bill of lading is] used as a combined transport bill of lading," that is, "[w]henever the Goods are transported by water, air, or overland, and are . . . carried to an in-land destination (Box 15)."  (*Id.*, Ex. 2A).  The bill of lading states that if the goods are to be carried to the inland destination identified in Box 15, "the Carrier undertakes to procure the entire transport from the place where the Goods are taken in charge to the place designated for delivery and to be directly responsible to the Merchant for any such through carriage."  (*Id.*, Ex. 2A).  The bill of lading identifies the carrier as "the National Shipping Company of Saudi Arabia . . . on whose behalf this Bill of Lading has been signed."  (*Id.*, Ex. 2A).  Shippers, Fitzley, and ATS do not contend that the National Shipping Company of Saudi Arabia was responsible for transporting the nacelle to any destination beyond Houston.  Nor do they contend that the National Shipping Company of Saudi Arabia had contracted with any of them to perform the inland transport of the nacelle, either to another destination in Houston or to Murray County.  Shippers and ATS have not shown how any additional discovery as to the terms for the nacelle's shipment, the parties' intent as to shipment, or the existence of other bills of lading is relevant to whether Shippers, Fitzley, and ATS may rely on the defenses and limitations in bill of lading number HF126BMHO-058 attached to Suzlon Wind and Codan's partial summary judgment motion.  The record shows that the bill of lading number HF126BMHO-058 was an ocean or port-to-port bill of lading issued by the National Shipping Company of Saudi Arabia for the overseas transport of the nacelle from Mumbai to Houston.

### 2. Does the Bill of Lading Extend COGSA Liability Limitations Beyond the Tackle-to-Tackle Period?

The bill of lading provides that for port-to-port shipments to or from United States ports, "the Carrier shall be liable from the time of the Goods are received at the loading port until the time the Goods have been delivered to the Merchant at the Port of Discharge (Box 13)." (Docket Entry No. 30, Ex. 2A).  Houston is listed in Box 13 of the bill of lading as the Port of Discharge.  The bill of lading defines the "Merchant" as "the Shipper, the Receiver, the Consignee, the Holder of the Bill of Lading, and the Owner of the Goods and the servants or agents of any of these."  (*Id.*, Ex. 2A).  Suzlon Energy Ltd., located in Mumbai, is identified as the "Shipper."  Suzlon Wind Energy Corporation, located in Illinois, is identified as the "Consignee."  The bill of lading limits liability for damage "to COGSA's $500 per package or per CFU, unless the nature and value of such Goods have been declared by the Shipper before shipment, inserted in the Bill of Lading, and an Ad Valorem freight rate paid to the Carrier."  (*Id.*, Ex. 2A).  The bill of lading also states that trades to or from the United States "shall be subject to the United States Carriage of Goods by Sea Act of 1836 . . ."  (*Id.*, Ex. 2A).

Suzlon Wind and Codan rely on *Sabah Shipyard SDN Bd.  v. M/V Harbel Tapper*, 178 F.3d 400 (5th Cir. 1999), *Wemhoener Pressen v. Ceres Marine Terminals, Inc.*, 5 F.3d 734, 738 n.3 (4th Cir. 1993), and  *Jagenberg, Inc. v. Ga. Ports Auth.*, 882 F.Supp. 1065 (S.D. Ga. 1995), to support their argument that the bill of lading fails to extend COGSA liability limitations beyond the tackle-to-tackle period.  Suzlon Wind and Codan argue that "[b]y reference to the type of language required to extend COGSA's protection, as exemplified in

the *Sabah*, *Jagenberg*, and *Wemhoener* cases, it is evident that the language in the Bill of Lading fails to do so."  (Docket Entry No. 43 at 4).  In both *Sabah* and *Wemhoener*, the bill of lading stated that COGSA applies "before loading, after discharge, and during the entire time when the cargo is *in the carrier's possession*" (emphasis added by Suzlon Wind and Codan).  *Sabah*, 178 F.3d at 407; *Wemhoener*, 5 F.3d at 738 n.3.  In *Jagenberg*, the bill of lading contained a "clause paramount" stating that "[i]f and to the extent that the provisions of the Harter Act . . . would otherwise be compulsorily applicable to regulate the Carrier's responsibility for the goods during any period prior to loading on or after discharge from the vessel the Carrier's responsibility shall instead be subject to COGSA."  882 F. Supp. at 1070. Shippers and Fitzley respond that in *Mori Seiki USA, Inc. v. M.V. Alligator Triumph*, 990 F.2d 444, 447 (9th Cir. 1993), the Ninth Circuit found that almost identical language in a bill of lading did extend COGSA's liability limitations beyond the tackle-to-tackle period. Shippers and Fitzley argue that there is a fact issue as to whether COGSA's liability limitations apply.

Suzlon Wind and Codan's reliance on *Sabah*, *Wemhoener*, and *Jagenberg* is misplaced.  Unlike the *Jagenberg* bill of lading, the National Shipping Company of Saudi Arabia bill of lading does not tie the applicability of COGSA's liability limitations to the statutory limit of the Harter Act.  Neither *Sabah* nor *Wemhoener* holds that a bill of lading must specify that COGSA governs while the cargo "is in the carrier's possession" to extend COGSA's liability limitations beyond the tackle-to-tackle period.  To the contrary, courts have found that different bill of lading terms—including terms similar to those at issue here—may extend COGSA's liability limitations beyond the tackle-to-tackle period.  *See,*

*e.g.*, *Starrag v. Maersk, Inc.*, 486 F.3d 607, 612–13 (9th Cir. 2007) (finding that a bill of lading's "period of responsibility clause" extended COGSA protections by stating that the carrier's liability will be determined according to COGSA "[w]here loss of damage has occurred between the time of receipt of the Goods by the Carrier at the port of loading and the time of delivery by the Carrier at the port of discharge, or during any prior or subsequent period of carriage by water"); *Mori Seiki USA*, 990 F.2d at  447 (finding that a bill of lading extended COGSA's protections by providing that "[w]ith respect to loss or damage occurring during the period from the time when the Goods arrived at the sea terminal at the port of loading to the time when they left the sea terminal at the port of discharge . . . [the carrier shall be responsible for such loss or damage] to the extent prescribed by [COGSA]); *Polimeros Tecnologia, S.A. (Polytec) v. Maersk Sealand*, No. Civ. A. H-05-0696, 2005 WL 3164238, at *2 (S.D. Tex. Nov. 28, 2005) (finding that a bill of lading extended COGSA's protections by providing that "[w]here the stage of Carriage where the damage occurred is known . . . the liability of the carrier in respect of such loss shall be determined . . . (b) in the case of shipments to or from the United States of America by the provisions of U.S. COGSA if the loss or damage is known to have occurred . . . during Carriage to or from a container yard or container freight station in or immediately adjacent to the sea terminal at the Port of Loading or of Discharge in ports of the USA"); *Ace Bag & Burlap Co., Inc. v. Sea-Land Serv., Inc.*, 40 F. Supp. 2d 233, 236 (D.N.J. 1999) (noting that "the bill of lading in this matter extends COGSA from the point of discharge *through delivery of the goods*" (emphasis added)).

In addition, the bill of lading at issue in this case includes the "in the custody of the

Carrier" language that defines the scope of COGSA's applicability.  Under a section entitled

"Carrier's Liability," the bill of lading provides:

> Where loss or damage to or in connection with Goods has occurred between the time of receipt and delivery of the Goods by the Carrier, *including any time during which the Goods are in the custody and possession of the Carrier or during any other period of responsibility of the Carrier under this Bill of Lading*, the liability of the Carrier shall be determined as follows:
>
> . . .
>
> > (b) TRADES TO OR FROM THE UNITED STATES shall be subject to the United States Carriage of Goods by Sea Act of 1983 . . . .

(Docket Entry No. 33, Ex. 2A) (emphasis added).  Under a section entitled "Responsibility,"

the bill of lading further states:

> (a) Port to Port Shipment:
>
> > The Carrier shall be liable for goods from the time the Goods have passed over the Vessel's ramp/rail at the time of loading at the Port of Loading (Box 12) until the time the Goods have passed over the Vessel's ramp/rail at the time of discharging at the Port of Discharge (Box 13).  For Goods to or from US Ports, the Carrier shall be liable from the time of the Goods are received at the loading port until the time the Goods have been delivered to the Merchant at the Port of Discharge (Box 13).

(*Id.*, Ex. 2A).  Courts have found similar language sufficient to extend COGSA's liability

limitations beyond the statutory period.  By its terms, the bill of lading extends COGSA's

applicability beyond the tackle-to-tackle period "until the time the Goods have been delivered to the Merchant at the Port of Discharge."[1]

> 3.  *Had Delivery Occurred under the Bill of Lading When the Nacelle Caught Fire?*

Shippers, Fitzley, and ATS argue that there are fact issues as to whether the nacelle had been "delivered" under the bill of lading when the fire occurred.  Suzlon Wind and Codan argue that the parties did not extend COGSA's application beyond the tackle-to-tackle period; that the Harter Act's definition of delivery applies; that under the Harter Act, delivery may be either actual or constructive delivery; and that both had occurred before the fire started.  Shippers seeks a continuance to discover "the status of the off-loading of the nacelles at the time of the fire."  (Docket Entry No. 35 at 3).

In determining whether "delivery" has occurred under either the Harter Act or COGSA, the Fifth Circuit has applies the term's "general legal meaning: the point at which the carrier has fulfilled its responsibilities to carry, discharge, and otherwise perform its contractual duties with respect to the cargo."[2]  *Servicios-Expoarma, C.A. v. Indus. Maritime*

---

[1]     A carrier may contractually extend COGSA's applicability to the period covered by the Harter Act.  *Sabah*, 178 F.3d at 409 (holding that "the contractual incorporation of COGSA's $500 per-package-or-per-unit limit on liability is not inconsistent with the Harter Act, and is enforceable").

[2]     The Fifth Circuit has defined "delivery" under both the Harter Act and COGSA according to general maritime law principles.  *See Mannesman*, 225 F.3d at 594 ("Thus, Harter Act 'delivery,' like COGSA 'delivery,' is interpreted according to the 'common law gloss' that 'delivery is not defined by receipt by the consignee, but rather occurs when the carrier has properly surrendered the goods in accordance with its contractual duties.'" (internal punctuation and citation omitted)); *see also Servicios-Expoarma, C.A. v. Indus. Maritime Carriers, Inc.*, 135 F.3d 984, 992 (5th Cir. 1998) (applying the Harter Act definition of delivery to the question of whether delivery had occurred under COGSA).  Because the definition of delivery under both acts is based on general maritime law, this court relies equally on cases discussing both Harter Act delivery and COGSA delivery.

*Carriers, Inc.*, 135 F.3d 984, 992 (5th Cir. 1998). "'Delivery' occurs when the carrier places the cargo into the custody of whomever is legally entitled to receive it from the carrier." *Id.* "General maritime law requires that a carrier 'unload the cargo onto a dock, segregate it by bill of lading and count, put it in a place of rest on the pier so that it is accessible to the consignee, and afford the consignee a reasonable opportunity to come and get it." *Id.* at 993 (citing *Tapco Nigeria v. M/V Westwind*, 702 F.2d 1252, 1255 (5th Cir. 1983)). These common-law requirements of proper delivery "are modified by the custom, regulations, or law of the port of destination." *Id.* (citing *Tapco Nigeria*, 702 F.2d at 1255–56). The Fifth Circuit has stressed that "delivery" delineates when the carrier's liability for the cargo ends. "Delivery" occurs when the ocean carrier fulfills its obligations under the bill of lading and surrenders the goods in accordance with its contractual duties. *See id.* at 991; *see also Mannesman*, 225 F.3d at 594 (citing *Servicios-Expoarma*, 135 F.3d at 991).

ATS argues that a fact issue exists as to whether "delivery" had occurred because "inland carriage had not been cleared." (Docket Entry No. 36 at 3). ATS emphasizes that additional support points were necessary before the nacelle could be trucked to its ultimate destination in Minnesota. ATS contends that because "loading operations needed to be completed," "[t]here is certainly a fact issue as to whether the cargo was loaded, or in the process of being loaded, when the fire started." (*Id.* at 3). ATS also argues that a fact issue exists as to which party had custody or control of the goods.

Shippers and Fitzley argue that Suzlon Wind and Codan have failed to show that the ocean carrier unloaded the nacelle onto a dock, segregated it by bill of lading and count, put it on a place of rest on the pier so that it was accessible to the consignee, and afforded the

consignee a reasonable opportunity to come and get it.  Shippers and Fitzley rely on language in *Jagenberg* to support their argument that delivery of the nacelle had not yet occurred when the fire started.  In *Jagenberg*, cargo was shipped under a through bill of lading from Rotterdam, The Netherlands, to Macon, Georgia, via the Port of Savannah, Georgia.  882 F. Supp. 1065.  The cargo arrived safely at the Port of Savannah.  Most of the cargo was trucked safely to Macon, but some was damaged before it could be loaded onto a truck for transport to Macon.  The *Jagenberg* bill of lading provided that COGSA would govern the carrier's responsibility "[i]f and to the extent that the provisions of the Harter Act  . . would otherwise be compulsorily applicable to regulate the Carrier's responsibility."  *Id.* at 1070.  The court examined whether delivery had occurred under the Harter Act to determine whether COGSA's liability limitations protected the carrier.  *Id.*  The court found "it advisable to keep sea carriers to the standards imposed by the Harter Act until goods are in the hands of land carriers *and actually leaving the maritime area*."  *Id.* at 1078 (emphasis added by Shippers and Fitzley).  Shippers and Fitzley argue that under *Jagenberg*, delivery had not occurred when the fire began because the nacelle had not yet left the port.

*Jagenberg* involved an intermodal through bill of lading under which the sea carrier was responsible for both the ocean and inland legs of transport.  Unwilling to extend the Harter Act, a maritime law, to the ultimate point of delivery in Macon, the *Jagenberg* court recognized that it needed to "find some principled manner of deciding when a proper delivery occurred beforehand, despite the fact that, technically, no agent of [the plaintiff] had a reasonable opportunity to take the goods into 'proper care and custody' before they reached Macon."  882 F. Supp. at 1077.  The court noted that if the transport had occurred under two

separate port-to-port bills of lading—an ocean bill of lading covering the transport from

Rotterdam to Savannah, and an inland bill of lading covering the transport from Savannah

to Macon—"the Court would find that proper delivery constituted loading the trucks,"

because "damage done after goods are loaded onto trucks occurs after proper delivery." *Id.*

The court found that because the goods were damaged at port before they were loaded onto

trucks, no proper delivery had occurred under the through bill of lading.  In reaching this

conclusion, the court noted that "the Harter Act is at its core a maritime law" but "*does* reach

to the point at which goods are loaded onto the vehicles of an inland trucker, whether hired

by the shipper or the carrier." *Id.* at 1077–78.  "Harter fills a potential gap between discharge

and inland transit in those situations where goods, though on the dock, are still within the

control and responsibility of the sea carrier." *Id.* at 1079.

In this case, the record shows that delivery by the National Shipping Company of

Saudi Arabia had occurred before the fire began.  The record shows that the National

Shipping Company of Saudi Arabia had performed its contractual duties with respect to the

nacelle.  The record shows that the National Shipping Company of Saudi Arabia did not have

control or responsibility over the nacelle when the fire started.  *See Servicios-Expoarma*, 135

F.3d at 991.  Kenneth Glazier stated in his affidavit that the nacelle was discharged at the

Barbours Cut Terminal on November 18, 2005.[3]  (Docket Entry No. 33, Ex. 1).  On January

---

[3]     Shippers objects to Kenneth Glazier's affidavit on the ground that the affidavit "does
not demonstrate Mr. Glazier's personal knowledge and is, therefore, hearsay."  (Docket Entry No.
40 at 1).  Shippers argues that Glazier cannot have personal knowledge of the facts that he related
in his affidavit because he was not present in Houston when the nacelle was discharged or when the
fire broke out.  It is not necessary for an affiant to be an eyewitness to events to have personal
knowledge of those events.  Glazier's statement that he has "personal knowledge of the facts herein
stated" lays a sufficient predicate for the affidavit.  (Docket Entry No. 33, Ex. 1).  Shippers's

18, 2006, the nacelle was loaded onto a Fitzley trailer.  The fire started during welding operations to incorporate additional support points for the nacelle's inland transport on the trailer.  (*Id.*, Ex. 1).  The fact that the nacelle had been loaded onto the trailer before the fire began makes clear that the National Shipping Company of Saudi Arabia had performed its obligations under the ocean bill of lading and was no longer responsible for the nacelle at that point.  Neither the ocean bill of lading nor COGSA or the Harter Act supports extending the National Shipping Company of Saudi Arabia's liability for the nacelle to the point when the nacelle was on the trailer of the truck for the inland transport over which the National Shipping Company of Saudi Arabia had no responsibility or involvement.  The fact that the nacelle required additional support points when it was loaded onto the trailer to finish making it ready for inland transport does not change the analysis.  None of the parties contends that the National Shipping Company of Saudi Arabia was responsible for the welding necessary to prepare the nacelle for inland transport.

Because delivery had occurred under the bill of lading, defenses and limitations under the bill of lading and COGSA are not available to Shippers, Fitzley, and ATS.  Suzlon Wind and Codan's motion for partial summary judgment is granted.[4]

## IV.    ABR and Pineiro's Motion to Dismiss

### A.    The Legal Standard

---

objection is denied.

[4]    Because this court does not consider or base its judgment on the summary judgment evidence submitted by Suzlon Wind and Codan, to which Shippers and Fitzley objected, it is unnecessary to rule on Shippers's and Fitzley's objections to rule on Suzlon Wind and Codan's motion for partial summary judgment.

Rule 12(b)(6) allows dismissal if a plaintiff fails "to state a claim upon which relief may be granted."  FED. R. CIV. P. 12(b)(6).  The Supreme Court recently clarified the standards that apply in a motion to dismiss for failure to state a claim.  In *Bell Atlantic Corp. v. Twombly*, 127 S. Ct. 1955, 1974 (2007), the Court confirmed that Rule 12(b)(6) must be read in conjunction with Rule 8(a),  which requires "a short and plain statement of the claim showing that the pleader is entitled to relief."  FED. R. CIV. P. 8(a)(2).  A court must not dismiss a complaint for failure to state a claim unless the plaintiff has failed to plead "enough facts to state a claim to relief that is plausible on its face."  *Twombly*, 127 S. Ct. at 1974; *see also Erickson v. Pardus*, 127 S. Ct. 2197, 2200 (2007).  Although material allegations in the complaint must be accepted as true and construed in the light most favorable to the nonmoving party, a court is not required to accept conclusory legal allegations cast in the form of factual allegations if those conclusions cannot reasonably be drawn from the facts alleged.

When a plaintiff's complaint must be dismissed for failure to state a claim, the plaintiff should generally be given at least one chance to amend the complaint under Rule 15(a) before dismissing the action with prejudice.  *Great Plains Trust Co. v. Morgan Stanley Dean Witter & Co.*, 313 F.3d 305, 329 (5th Cir. 2002) ("[D]istrict courts often afford plaintiffs at least one opportunity to cure pleading deficiencies before dismissing a case, unless it is clear that the defects are incurable or the plaintiffs advise the court that they are unwilling or unable to amend in a manner that will avoid dismissal.").  However, a plaintiff should be denied leave to amend a complaint if the court determines that "allegations of other facts consistent with the challenged pleading could not possibly cure the deficiency."

*Schreiber Distrib. Co. v. Serv-Well Furniture Co., Inc.*, 806 F.2d 1393, 1401 (9th Cir. 1986); *see also Great Plains Trust Co.*, 313 F.3d at 329; *Jacquez v. R.K. Procunier*, 801 F.2d 789, 792 (5th Cir. 1996).

In considering a motion to dismiss for failure to state a claim, a district court must limit itself to the contents of the pleadings, including attachments thereto.  FED.  R. CIV. P. 12(b)(6).  Various circuits have specifically allowed that "[d]ocuments that a defendant attaches to a motion to dismiss are considered part of the pleadings if they are referred to in the plaintiff's complaint and are central to her claim."  *Venture Assocs. Corp. v. Zenith Data Sys. Corp.*, 987 F.2d 429, 431 (7th Cir. 1993); *see also Branch v. Tunnell*, 14 F.3d 449, 453–54 (9th Cir. 1994); *Field v. Trump*, 850 F.2d 938, 949 (2d Cir. 1998); *Sheppard v. Texas Dep't of Transp.*, 158 F.R.D. 592, 595 (E.D. Tex. 1994).  In so attaching, the defendant merely assists the plaintiff in establishing the basis of the suit, and the court in making the elementary determination of whether a claim has been stated.  The Fifth Circuit has approved of this practice.  *Collins v. Morgan Stanley Dean Witter*, 224 F.3d  496 (5th Cir. 2000).  To consider other matters outside the pleadings, however, a court must convert the motion to dismiss to one for summary judgment under Rule 56.

### B.    Contribution and Indemnity

ABR and Pineiro have moved to dismiss ATS and Fitzley's third-party complaint or, in the alternative, for summary judgment on ATS and Fitzley's claims for indemnity and contribution.  Because the parties submit, and this court considers, other matters outside the pleadings, ABR and Pineiro's motion to dismiss in converted to one for summary judgment under Rule 56.

ABR and Pineiro argue that because they have no contractual relationship with either ATS or Fitzley, ATS and Fitzley must base their contribution and indemnity claims on Texas common law. Citing *B&B Auto Supply v. Central Freight Lines, Inc.*, 603 S.W.2d 814, 816–17 (Tex. 1980), ABR and Pineiro contend that after Texas adopted a comparative negligence system, the Texas Supreme Court abolished common-law indemnity between joint tortfeasors. ABR and Pineiro also argue that under general maritime law, comparative fault has displaced the general concept of tort indemnity and that ATS and Fitzley do not qualify for the few viable indemnity theories that remain. Lastly, ABR and Pineiro argue that ATS and Fitzley's contribution claim is premature because a court has not yet adjudicated the issue of liability, and should be dismissed.

ATS and Fitzley argue that the ocean bill of lading contains an indemnity provision that allow them to seek indemnity against ABR and Pineiro. The bill of lading provides as follows:

> The Merchant shall Indemnify the Carrier against any loss, damage, liability or expense whatsoever and howsoever arising caused by performing of the matters referred to in paragraphs (a)(I), (ii), or (iii) above, save that where the loss, damage, liability, or expense was caused by a matter referred to in paragraph (a)(iii) the Merchant shall not be liable to indemnify the Carrier in respect thereof unless both the provisions referred to in that paragraph apply.

(Docket Entry No. 64, Ex. A). ATS and Fitzley argue that because they "could be classified as either an independent contractor and/or sub contractor of the carrier and/or underlying carrier," they are "entitled to stand in the shoes of the carrier, pursuant to the Himalaya clause, and avail [themselves] to the benefits, defenses, and limits of liability in the ocean bill

of lading."  (Docket Entry No. 64 at 4; Docket Entry No. 67 at 5).   ATS and Fitzley further argue that the term "Merchant" in the bill of lading includes ABR and Pineiro as Suzlon Wind's agents because Shippers, acting on Suzlon Wind's request, hired ABR and Pineiro to perform the welding.   ATS and Fitzley contend that the bill of lading provides a contractual basis for their indemnity claim against ABR and Pineiro.   In addition, ATS and Fitzley assert that under Federal Rule of Civil Procedure 14(a), a determination of liability is not a condition precedent to filing a third-party claim for contribution.

In response, ABR and Pineiro argue that "[i]t is undisputed that ATS, Fitzley, and ABR are not parties to the ocean bill of lading."  (Docket Entry No. 75 at 1).  ABR and Pineiro argue that because no commercial relationship exists between Fitzley and the National Shipping Company of Saudi Arabia and that because ATS has acknowledged that it was acting on behalf of Suzlon Wind, ATS and Fitzley are not a "Carrier" or agents of the "Carrier" under the bill of lading.  ABR and Pineiro also contend that even if ATS and Fitzley may claim the benefit of defenses and liability limitations available under COGSA, the Himalaya clause does not extend the bill of lading's indemnification provision to ATS and Fitzley.

As noted above, the bill of lading is a port-to-port bill of lading that covers only the ocean leg of the nacelle's transport.  The bill of lading defines the "Carrier" as the National Shipping Company of Saudi Arabia.  ATS and Fitzley do not contend that they had a contractual, master–servant, or agency relationship with the National Shipping Company of Saudi Arabia.  To the contrary, the record shows that Suzlon Wind hired ATS to handle inland transportation of the nacelle and ATS in turn hired Fitzley to provide drivers, trucks,

and trailers for the inland transport.  The ocean bill of lading that covered the nacelle's ocean transport from Mumbai to the Port of Houston does not provide a contractual basis for ATS and Fitzley's indemnification claims.

Because no contractual basis for indemnity exists, ATS and Fitzley's claim for indemnification against ABR and Pineiro fails.  The Texas Supreme Court has held that the common-law right of indemnity is no longer available between joint tortfeasors in negligence cases because Texas has adopted a system of comparative negligence.  *See B&B Auto Supply*, 603 S.W.2d at 816–817; *see also Hardy v. Gulf Oil Corp.*, 949 F.2d 826, 830–31 (5th Cir. 1992) (noting that the Texas Supreme Court has held that article 2212a of the Texas Revised Civil Statutes "abolished the common law doctrine of indemnity between joint tortfeasors" and that "a defendant cannot ordinarily claim a right to common law indemnity from a joint tortfeasor").

In lieu of claiming common-law indemnity, joint tortfeasors must now seek contribution under Texas's system of comparative negligence.  *See* TEX. CIV. PRAC. & REM. CODE § 33.015 ("If a defendant who is jointly and severally liable pays a larger proportion of those damages than is required by his percentage of responsibility, that defendant has a right of contribution for the overpayment against each other defendant with whom he is jointly and severally liable . . .").  ATS and Fitzley allege that "[s]ome or all of the damages incurred by [Suzlon Wind, Suzlon Energy, and Codan] were due to the negligent conduct" of ABR and Pineiro.  ATS and Fitzley argue that Pineiro negligently failed to use reasonable care while performing the welding operations.  ATS and Fitzley have shown a basis for asserting a third-party claim against ABR and Pineiro under Federal Rule of Civil Procedure

14(a), which allows a defendant to bring in a third party "who is or may be liable to him for all or part of the plaintiff's claim against him."  ABR and Pineiro cite no cases to support their argument that summary judgment is proper as to ATS and Fitzley's claim for contribution because a court has not adjudicated the issue of liability between the parties.

ABR and Pineiro's summary judgment motion is granted as to ATS and Fitzley's claims for indemnity.  ABR and Pineiro's summary judgment motion is denied as to ATS and Fitzley's claims for contribution.

## IV.    Conclusion

Suzlon Energy's motion to dismiss for lack of personal jurisdiction is denied.  Suzlon Wind and Codan's motion for partial summary judgment is granted.  ABR and Pineiro's summary judgment motion is granted as to ATS and Fitzley's indemnity claims and denied as to ATS and Fitzley's contribution claims.

SIGNED on March 7, 2008, at Houston, Texas.

_____

Lee H. Rosenthal
United States District Judge

41