**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| SUZLON WIND ENERGY | § | |
| CORPORATION, *et al.*, | § | |
| | § | |
| Plaintiffs, | § | |
| | § | |
| v. | § | CIVIL ACTION NO. H-07-155 |
| | § | |
| SHIPPERS STEVEDORING COMPANY, | § | |
| *et al.*, | § | |
| | § | |
| Defendants. | § | |

**MEMORANDUM AND OPINION**

This suit arises from a fire that damaged a nacelle, which is part of a wind turbine generator. The nacelle was manufactured in India and shipped to the Port of Houston for inland transport to Minnesota. The fire occurred after the nacelle had been unloaded from the ship at the Port of Houston, during preparations for transport on a truck-trailer. Those preparations included "hot work" to secure the nacelle to the trailer.

Suzlon Energy Ltd. ("Suzlon Energy"), based in India, designed and manufactured the wind turbine. Suzlon Wind Energy Corporation ("Suzlon Wind") was the American distributor. The plaintiffs, Suzlon Wind and its insurer, Codan Forsikring A/S ("Codan"), sued Shippers Stevedoring Company ("Shippers"), the stevedoring company that performed the hot work; ATS Wind Energy Services, a Division of Anderson Trucking Services ("ATS"), which contracted with Suzlon Wind to handle the nacelle's inland transport to Minnesota; and Fitzley, Inc. ("Fitzley"), which was hired by ATS to provide the drivers, trucks, and trailers to transport the nacelle. Suzlon Wind and Codan alleged negligence in preparing the nacelle for its inland transport. The day after Suzlon Wind filed this suit, Shippers filed a declaratory judgment action against Suzlon Wind and Suzlon Energy

seeking to eliminate or limit liability for the fire damage to the nacelle.  The two suits were consolidated.  (Docket Entry No. 4).

ATS and Fitzley filed a third-party complaint seeking indemnification or contribution from Andrews Boom Repair, Inc. ("ABR"), the welding company that Shippers hired, and from ABR employee Pablo Pineiro, who did the welding work.  (Docket Entry No. 50).  Suzlon Wind and Codan cross-claimed against ABR and Pineiro.  (Docket Entry No. 52).

On June 29, 2007, Suzlon Wind and Codan moved for partial summary judgment that Shippers, ATS, and Fitzley could not rely on the terms, conditions, limitations, or defenses contained in the bill of lading for the nacelle's ocean shipment.  (Docket Entry No. 33).  On March 7, 2008, this court granted the plaintiffs' motion, concluding that defenses and limitations under the bill of lading and COGSA were not applicable.  (Docket Entry No. 78).  Following mediation, Suzlon Wind and Codan settled their claims against ATS and Fitzley.  Those claims, as well as all cross-claims involving ATS and Fitzley were dismissed on May 30, 2008.  (Docket Entry No. 134).

The following motions are pending:

- Suzlon Wind and Codan have moved for partial summary judgment granting their breach of contract claim against Shippers.  (Docket Entry No. 143).  Shippers filed a response, (Docket Entry No. 153); Suzlon Wind and Codan replied,  (Docket Entry No. 156); Shippers filed a surreply, (Docket Entry No. 167); and Suzlon Wind and Codan replied to the surreply, (Docket Entry No. 171).

- Shippers has moved for leave to amend its answer and counterclaim, (Docket Entry No. 146).  Suzlon Wind and Codan responded, (Docket Entry No. 154); Shippers replied, (Docket Entry No. 164); and Suzlon Wind and Codan filed a surreply,

(Docket Entry No. 166).  ABR filed a joinder to Shippers's motion for leave to amend, (Docket Entry No. 162); Suzlon Wind and Codan responded, (Docket Entry No. 169); and ABR replied, (Docket Entry No. 177).

- Shippers has moved for partial summary judgment dismissing the plaintiffs' breach of contract and negligence *per se* claims, (Docket Entry No. 158), to which  Suzlon Wind and Codan responded, (Docket Entry No. 174).  Shippers filed a motion to consider additional evidence, (Docket Entry No. 182), which Suzlon Wind and Codan opposed, (Docket Entry No. 183).  Shippers filed a second motion to consider additional evidence, (Docket Entry No. 184), and Suzlon Wind and Codan responded, (Docket Entry No. 188).

- ABR moved for partial summary judgment dismissing the plaintiffs' claims against it, (Docket Entry No. 160).  Suzlon Wind and Codan responded, (Docket Entry No. 170), and ABR replied, (Docket Entry No. 180).

- Suzlon Wind and Codan moved to exclude the testimony of Ruben Arredondo, a witness ABR designated, (Docket Entry No. 157).  ABR responded, (Docket Entry No. 168), and Suzlon Wind and Codan replied, (Docket Entry No. 176).

- ABR moved to exclude the testimony of Dr. Lawrence M. Matta, an expert the plaintiffs designated, (Docket Entry No. 163).  Suzlon Wind and Codan responded, (Docket Entry No. 173), as did Suzlon Energy, (Docket Entry No. 175), and ABR replied, (Docket Entry No. 178).

- ABR moved to exclude the testimony of Haskell Simpkins, an expert the plaintiffs designated, (Docket Entry No. 186).  Suzlon Wind and Codan responded, (Docket

3

Entry No. 189), and ABR replied, (Docket Entry No. 193).

- ABR moved to compel production of documents by Suzlon Wind and Codan, (Docket Entry No. 159).  Suzlon Wind and Codan responded, (Docket Entry No. 172); ABR replied, (Docket Entry No. 179); and Suzlon Wind and Codan filed a surreply, (Docket Entry No. 181).

- ABR moved to compel the deposition of Suzlon Wind's CEO Andy Cukurs, (Docket Entry No. 187).  Suzlon Wind and Codan responded, (Docket Entry No. 190), and ABR replied, (Docket Entry No. 192).

Based on a careful review of the motions, responses, and replies; the record; the parties' submissions; and the applicable law, this court:

- grants Shippers's motion to consider additional evidence in connection with the summary judgment motions, (Docket Entry No. 184);[1]

- grants the motions for leave to amend filed by Shippers and ABR;

- denies the plaintiffs' motion for summary judgment on their breach of contract claim;

- grants in part and denies in part Shippers's motion for partial summary judgment on the plaintiffs' breach of contract and negligence *per se* claims;

- grants ABR's motion for partial summary judgment on the plaintiffs' claims;

---

[1]  Shippers submitted a "Suzlon Health & Safety Handbook," (Docket Entry No. 182, Ex. M), for this court's consideration in ruling on the summary judgment motions.  Because this court does not consider or base its judgment on the "Suzlon Health & Safety Handbook" submitted by Shippers, to which the plaintiffs objected, it is unnecessary to rule on the plaintiffs' objection to rule on the motions for summary judgment.  Shippers's motion, (Docket Entry No. 182), is denied.

- grants in part and denies in part the plaintiffs' motion to exclude Arredondo's expert testimony;

- denies ABR's motion to exclude Matta's expert testimony;

- grants in part and denies in part ABR's motion to exclude Simpkins's expert testimony;

- grants in part and denies in part ABR's motion to compel documents from Suzlon Wind and Codan; and

- denies ABR's motion to compel the deposition of Cukurs.

The reasons for these rulings are explained below.

## I.    Background

Suzlon Energy regularly ships wind energy equipment that it designs and manufactures from India to its United States distributor, Suzlon Wind.  Shortly before the shipment at issue, two fires occurred in nacelles manufactured by Suzlon Energy.  The first of the fires occurred on October 25, 2005 in a nacelle on board the *BBC Canada* in the Houston ship channel.  The fire started while welders were performing hot work to remove a clip securing the nacelle to the ship's deck.  The nacelle's polyurethane foam insulation and fiberglass shell ignited and provided fuel for the fire.  The crew, which had maintained a fire watch and had multiple fire extinguishers, was able to put the fire out.  The second of the fires occurred on November 11, 2005 in Minnesota.  A nacelle caught fire while hot work was being performed during installation.  The fire started when sparks or "slag" from a worker's oxyacetylene torch ignited the foam insulation inside the nacelle.  One worker was killed.  Kenneth Glazier, in-house counsel and a vice-president of Suzlon Wind,

received a report on the *BBC Canada* fire and damage to the nacelle.  Glazier also promptly learned of the Minnesota fire and wrote a report on it.

On the day of the Minnesota fire, Suzlon Wind's Chief Operating Officer, John Hewitt, issued a "MANDATORY INSTRUCTION" that "NO HOT WORK" be performed near any Suzlon Wind turbine until further notice.  (Docket Entry No. 153, Ex. B).  Glazier testified that the instruction applied to all Suzlon employees and to anyone working on a Suzlon nacelle.  (Docket Entry No. 153, Ex. A, Glazier Deposition, at 111:24-112:5).  Glazier also testified that he would want to tell anyone doing hot work on a Suzlon nacelle about the no-hot-work mandatory instruction.  (*Id.*, at 112:6-9).  Suzlon Wind's position in this lawsuit is that the no-hot-work instruction applied only to nacelles undergoing assembly or being installed on the job site, not to nacelles that were being prepared for transport.  (*Id.*, at 117:14-25).

On November 17, 2005, Steve Mikel, head of Suzlon Wind's Minnesota operation, issued a memorandum on "Foam Removal Procedure."  (Docket Entry No. 153, Ex. D).  Glazier testified that Suzlon Wind instituted this procedure because "[t]he polyurethane foam (accoustical egg crate foam) has a potential to catch fire if an ignition source is present within the nacelle."  Suzlon Wind required "[a]s a necessary precaution, [that] the polyurethane foam . . . be removed from the nacelle" before hot work was performed.  (*Id.*).  After the November 2005 fire, at the request of Suzlon Wind, Suzlon Energy stopped putting insulation in the nacelles that it manufactured and shipped to the United States.  (Docket Entry No. 153, Ex. A, Glazier Deposition, at 122:14-21).

The nacelle at issue was shipped by Suzlon Energy to Suzlon Wind as part of a cargo of wind-energy equipment in November 2005.  The cargo, including four nacelles, was shipped from Mumbai, India to the Port of Houston on board the *M/V Saudi Hofuf* under bill of lading

HF126BMHO-058.  The nacelle at issue was discharged on November 18, 2005 at the Barbours Cut

Terminal in the Port of Houston at a site operated by Shippers.  Suzlon Wind retained ATS to handle

the inland transport of the cargo, including the nacelle, from the Port of Houston to its ultimate

destination in Minnesota.  ATS hired drivers, trucks, and trailers from Fitzley for the transport.

ATS learned that under applicable United States Department of Transportation regulations,

transport on the Fitzley trailers required additional support points for tie-downs in the nacelle

shipping stands.  ATS consulted with Suzlon Wind about these additional support points and where

they would be placed on the shipping stands.  Suzlon Wind asked its agent, Project Logistics

International, Inc. ("PLI"), to arrange for the hot work needed to cut holes on the shipping stands

for the tie-downs.  PLI's Ove Christensen contacted Shippers's Operations Manager, William

Templet, to ask Shippers to have the hot work done.  When Christensen asked Templet if Shippers

required an indemnity letter to do the hot work, Templet said "yes."  (Docket Entry No. 153, Ex. E,

Deposition of William Templet at 11:20-12:1).

In the early morning of January 17, 2006, Glazier received a report he had requested from

a Suzlon Energy engineer, Rakesh Dhakar, about the October 2005 nacelle fire.  (Docket Entry No.

184, Ex. O).  The report contained photographs of the nacelle's parts as well as Dhakar's

observations and conclusions about the damage.  (*Id.*).  Glazier asked for this report because Suzlon

Wind had shipped the fire-damaged nacelle to Minnesota and planned to use the undamaged parts

to repair another nacelle.  (*Id.*).  Dhakar concluded that the October 2005 fire had started in the front

section of the nacelle.  While the fire affected mostly the front half, the foam inside was "totally

burnt."  (*Id.*).  Dhakar recommended that in the future, Suzlon "must use the fire resistant accoustic

foam" in the nacelles.  (*Id.*).

Later that day, January 17, Glazier spoke with Templet, the Shippers Operation Manager, about the hot work.  Glazier told Templet that Suzlon Wind would provide Shippers an indemnity letter.  Glazier advised Templet that fire blankets and fire extinguishers had to be available during the hot work but did not mention any specific fire precautions.  (Docket Entry No. 153, Ex. E, Templet Deposition, at 107:9-108:23).  Glazier did not inform Templet about the two recent nacelle fires, the no-hot-work instruction that had issued on November 11, 2005, or the foam-removal procedure for Suzlon nacelles that had issued on November 17, 2005.  Templet testified that neither Glazier nor Christensen placed any stress on the need for fire precautions other than fire blankets and extinguishers.  (*Id.*).  Templet testified that Shippers would not have agreed to do the hot work if he had known about Suzlon's ban on hot work on all nacelles and the two recent Suzlon nacelle fires.  (*Id.*, Ex. E., Templet Deposition, at 100:13-17).

Glazier sent Templet the indemnity letter the afternoon of January 17, 2006.  (Docket Entry No. 184, Ex. P).  The letter stated in relevant part:

> Suzlon Wind . . . has requested Shipper's . . . to cut holes today about two inches thick in diameter in the corners of the shipping stands of four Suzlon nacelles (16 total cuts).  This work will be pursuant to instructions from ATS Wind Energy Services and to enable them to chain the nacelles and shipping stands to their trucks.  [Suzlon Wind] will pay you for this work based on your time and materials pursuant to prior arrangements.
>
> Careful fire precautions are necessary because this will be hot work near the nacelles.  Shipper's Stevedoring must use fire blankets to cover the nacelles, have fire extinguishers available, and adhere to other customary good practices and fire prevention procedures, while performing this work.  If you do so, and absent any other negligence on your part [Suzlon Wind] will indemnify Shipper's Stevedoring and hold it harmless from any damage or liability resulting from this work.

(Docket Entry No. 143, Ex. 1).  Glazier testified that he did not specifically mention that the

insulation was flammable.  Nor did he inform Shippers about the previous fires and the no-hot-work mandatory instruction.  He assumed that Shippers was aware of the Minnesota fire because of the fact they were requesting an indemnity letter from Suzlon Wind to do the hot work.  (Docket Entry No. 153, Ex. A, Glazier Deposition, at 257:9-259:13).

Shippers alleges that Suzlon Wind intentionally did not disclose information about the previous nacelle fires, the no-hot-work mandatory instruction, or foam-removal procedure.  Shippers alleges that Suzlon Wind misrepresented that such general precautions as using fire blankets and having fire extinguishers available would be enough because Suzlon Wind needed to get the nacelle to Minnesota quickly.  On January 10, 2006, ATS had informed Hewitt that Suzlon Wind needed to ship the four nacelles from the Port of Houston to Minnesota as soon as possible because Minnesota law prohibited moving heavy equipment "once frost comes out of the ground," which ATS said could occur as early as February.  (Docket Entry No. 153, Ex. A, Glazier Deposition, 145:19-146:8).  Suzlon Wind had to install and commission the nacelles by February 22, 2006 or it would be contractually obligated to reimburse the nacelle owners for lost incentive payments the owners would have received from the State of Minnesota.  (*Id.*, Glazier Deposition at 172:21-173:11).  Glazier testified that on January 17, 2006, Suzlon Wind was under "severe time constraints" and needed the holes cut in the shipping stands the next day because trucks and cranes were waiting and Suzlon Wind would have to pay for them even if the nacelles were not ready to ship.  In addition, Glazier was not sure if the trucks and cranes would be available later.  (*Id.*, Glazier Deposition at 254:21-255:21).

After receiving the indemnity letter from Glazier, Templet called Pablo Pineiro of ABR and hired him to do the hot work on the shipping stands.  Pineiro was an experienced open-flame welder

9

who had done welding work for Shippers for nineteen years.  Templet asked Pineiro to come to Shippers's site at Barbours Cut on January 18, 2006.  Templet told Pineiro to bring a torch, fire blankets, and fire extinguishers.  (Docket Entry No. 143, Ex. 3, Templet Deposition, 19:1-6).

On January 18, 2006, the nacelle at issue was loaded onto a Fitzley trailer.  An ATS representative, Don Finnvik, was on site.  Pineiro arrived early that morning with an oxyacetylene torch, a six-by-seven foot fire blanket, and a fire extinguisher.  Two other fire extinguishers were present at the site.  There were no written instructions on how Pineiro was to cut the holes in the shipping stands.

The shipping stand was at the base of the nacelle.  Approximately two feet above the stand was a small gap, which extended all the way around the nacelle and led to the nacelle's interior.  The interior was lined with polyurethane foam insulation.  Pineiro testified in his deposition that when he looked inside the gap, it was dark and he could not see anything.  (Docket Entry No. 143, Ex. 5, Pineiro Deposition at 73:9-15).  Finnvik showed Pineiro where to cut the holes and how to use his fire blanket to cover the gap between the nacelle's outer shell and the shipping stand.  Pineiro placed the blanket so that it was covering the gap for two feet on one side and four feet on the other side.  Because the outer shell was made of fiberglass, the fire blanket would not stay up on its own.  Finnvik told Pineiro to use a piece of plywood to hold the fire blanket in place against the nacelle base.

The Fitzley truck driver on the site, Christopher Fuqua, testified that while Pineiro was cutting holes in the first nacelle's shipping stand, a plastic tarp covering the nacelle caught fire and burned.  (Docket Entry No. 167, Ex. 2, Fuqua Deposition at 17-19).  Pineiro denied that a tarp caught fire.  (Docket Entry No. 143, Ex. 5, Pineiro Deposition at 20:21-21:5).

10

After cutting the holes in the shipping stand of the first nacelle, Pineiro moved on to the second nacelle.  He set up his fire blanket the way Finnvik had shown him with the first nacelle. Pineiro began using his torch to cut the holes in the shipping stand.  He was nearly finished with the first hole on the second nacelle when he heard a "whoosh" sound behind him, from within the nacelle.  He saw smoke and flames coming out of the nacelle approximately five to ten feet behind where he had been cutting.  Fuqua testified that he was on the trailer making adjustments when he felt heat on his back and turned around.  He saw a cloud and a shadow and jumped off the trailer. (Docket Entry No. 167, Ex. 2, Fuqua Deposition at 20:13-19).  Fuqua testified that the nacelle was totally engulfed in flames shortly after he jumped off.  (*Id.*, Ex. 2, Fuqua Deposition at 66:5-7). Pineiro unsuccessfully tried to put the fire out with the extinguishers.  He then called the Fire Department.

Suzlon Wind and Codan assert that the damage to the nacelle resulting from the fire was $848,502.27.  Suzlon Wind and Codan allege that the defendants negligently failed to use adequate fire blankets, to have an adequate number of fire blankets, or to have an adequate number of fire extinguishers.  Suzlon Wind and Codan also allege that the defendants failed to post a fire watch; properly supervise the welding operations; engage a competent welder; safely perform welding operations; obtain a hot-work permit; and follow required hot-work safety procedures.  (Docket Entry No. 139, at 3).

These motions followed extensive discovery.

## II.    The Motions for Leave to Amend

Shippers seeks leave to amend its answer to assert several affirmative defenses to contract formation, including fraudulent inducement, and to counterclaim against Suzlon Wind for fraud by

nondisclosure.  ABR has joined in Shippers's motion, asserting that "the arguments and authorities cited by Shippers Stevedoring Company are equally applicable to ABR."  (Docket Entry No. 162). Suzlon Wind and Codan oppose these motions, arguing that Shippers and ABR unduly delayed seeking leave to amend their answers and that allowing these defenses and counterclaims would be unduly prejudicial.

### A.    The Legal Standard

Rule 15(a) of the Federal Rules of Civil Procedure provides that a party may amend its pleading once without seeking leave of court or the consent of the adverse party at any time before a responsive pleading is served.  After a responsive pleading is served, a party may amend only "with the opposing party's written consent or the court's leave."  FED. R. CIV. P. 15(a).  Rule 15(a) instructs that "[t]he court should freely give leave when justice so requires."  *Id.*  The rule "evinces a bias in favor of granting leave to amend."  *Jones v. Robinson Prop. Group*, *L.P.*, 427 F.3d 987, 994 (5th Cir. 2005) (quoting *Lyn-Lea Travel Corp. v. Am. Airlines*, *Inc.*, 283 F.3d 282, 286 (5th Cir. 2002)).  But leave to amend "is not automatic."  *Matagorda Ventures, Inc. v. Travelers Lloyds Ins. Co.*, 203 F.Supp.2d 704, 718 (S.D.Tex. 2000) (citing *Dussouy v. Gulf Coast Inv. Corp.*, 660 F.2d 594, 598 (5th Cir. 1981)).  Whether to allow amendment "lies within the sound discretion of the district court."  *Little v. Liquid Air Corp.*, 952 F.2d 841, 845-46 (5th Cir. 1992).  A district court reviewing a motion to amend pleadings under Rule 15(a) may consider "whether there has been 'undue delay, bad faith or dilatory motive, . . . undue prejudice to the opposing party, and futility of amendment.'"  *Jacobsen v. Osborne*, 133 F.3d 315, 318 (5th Cir. 1998) (quoting *In re Southmark Corp.*, 88 F.3d 311, 314-15 (5th Cir. 1996)).

### B.    Analysis

This lawsuit was filed on January 15, 2007.  Shippers filed its original answer on February 7, 2007.  (Docket Entry No. 10).  Suzlon Wind and Codan have filed three amended complaints.  (Docket Entry Nos. 86, 101, 137).  Shippers asserts that it seeks leave to amend to "plead responsively to Suzlon Wind Energy Corporation's Second and Third Amended Complaint." (Docket Entry No. 146, at 2).

Shippers argues that it first learned the factual basis for its fraud-by-non-disclosure claim on February 28, 2008.  That was when Glazier testified that he knew about the previous fires, the no-hot-work instruction, and the foam-removal procedure but did not relay the information to anyone at Shippers or ABR.  Glazier was Shippers's primary contact person at Suzlon Wind about the hot work at issue.  On March 27, 2008, Shippers sought leave to amend its declaratory judgment complaint to assert a fraud-by-non-disclosure claim against Suzlon Wind.  (Docket Entry No. 93).  This court denied Shippers's motion on May 7, 2008 because the proposed amended complaint did not plead fraud with the particularity required by Rule 9(b) of the Federal Rules of Civil Procedure.[2]  (Docket Entry No. 128).  Shippers filed the present motion for leave to amend its answer and counterclaim on September 11, 2008.  Shippers asserts that it sought leave to amend when Hewitt's August 19, 2008 deposition testimony about Suzlon Wind's policy forbidding hot work near nacelles and Suzlon's failure to disclose this policy to Shippers provided the detailed facts that had been missing earlier. (Docket Entry No. 146, at 2).  Shippers asserts that the proposed amended pleading cured the pleading deficiencies this court had identified in denying Shippers's earlier motion for

---

[2]  The particularity required under Rule 9(b) includes the "'time, place, and contents of the false representations,' as well as the identity of the person making the representation and what that person obtained thereby."  *United States ex rel. Willard v. Humana Health Plan of Tex., Inc.*, 336 F.3d 375, 384 (5th Cir. 2003) (quoting *Williams v. WMX Techs., Inc.*, 112 F.3d 175, 179 (5th Cir. 1997)).

leave to amend its declaratory-judgment complaint.  (Docket Entry No. 146).

Suzlon Wind and Codan dispute that Hewitt's August 2008 deposition testimony first provided Shippers the factual basis needed to plead fraud with particularity.  Suzlon Wind and Codan argue that these facts were "elicited from documents and depositions obtained and completed long ago, and far in advance of [Shippers] seeking leave to amend."  (Docket Entry No. 154, at 4).  Suzlon Wind and Codan argue that Shippers has had the "No Hot Work" instruction since September 2007.  Suzlon Wind and Codan argue that by delaying in seeking leave to amend to assert defenses to contract formation and a counterclaim for fraud, Shippers is seeking to "change the landscape of this litigation" on "the eve of trial."  Suzlon Wind and Codan assert that from the outset, Shippers has taken the position that the January 17, 2006 indemnity letter is a binding agreement and is seeking to change course late in the litigation in a "desperate attempt . . . to avoid summary judgment on Plaintiffs' breach of contract claim."  (Docket Entry No. 166, at 3).  Suzlon Wind and Codan assert that they will be prejudiced by facing a new affirmative defense and a new counterclaim late in the litigation.

Shippers first sought leave to amend in March 2008.  That was one month after Glazier's deposition provided details about his knowledge of the recent nacelle fires and the fire-prevention directions and procedures Suzlon Wind put into place as a result.  That one month is not "undue" delay.  That motion was denied for lack of particularity in May 2008.  Shippers filed the present motion in September 2008.  This motion was filed a month after Hewitt's deposition testimony.

The "[m]ere passage of time need not result in refusal of leave to amend; on the contrary it is only undue delay that forecloses amendment."  *Dussuoy*, 660 F.2d at 598; *see also Mayeaux v. La. Health Serv. & Indem. Co.*, 376 F.3d 420, 427 (5th Cir. 2004) (delay alone is insufficient to deny

14

leave to amend).  "Amendment can be appropriate as late as trial or even after trial."  *Dussouy*, 660

F.2d at 598.  Undue delay is present when an amendment is untimely and would prejudice the

nonmoving party and impose unwarranted burdens on the court.  *Mayeaux*, 376 F.3d at 427.

The delay in filing the motions was not extensive.  Nor will Suzlon Wind and Codan be

unfairly prejudiced if leave to amend is granted.  A party is prejudiced "if an added claim would

require [it] 'to reopen discovery and prepare a defense for a claim different from the [one] . . . that

was before the court.'"  *Smith v. EMC Corp.*, 393 F.3d 590, 596 (5th Cir. 2004) (quoting *Duggins*

*v. Steak 'N Shake*, *Inc.*, 195 F.3d 828, 834 (6th Cir. 1999)).  The proposed amendment would not

unfairly prejudice Suzlon Wind and Codan because they have had notice of the nature of the added

claims against them.  *See Lowrey v. Tex. A & M Univ. Sys.*, 117 F.3d 242, 245 (5th Cir. 1997) (the

"touchstone of the [prejudice] inquiry under Rule 15(a) is whether the proposed amendment" would

"deny[] defendants notice of the nature of the complaint").  Suzlon Wind and Codan have been

aware of Shippers's intent to assert affirmative defenses and claims based on fraud and

nondisclosure by Suzlon Wind since at least March 27, 2008.  Significant discovery has been

exchanged on the previous nacelle fires, the no-hot-work instruction, and the foam-removal

procedure.  Because no delay or additional discovery is necessary, no unwarranted burden is placed

on either the parties or on this court by allowing the amendment.

Suzlon Wind and Codan cite cases in which leave to amend was denied because the motion

seeking leave was not filed until after the opposing party moved for summary judgment.  *See*

*Matagorda Ventures*, 203 F.Supp.2d at 720; *Butschek v. Southwestern Bell Telephone Co.*, 952

F.Supp. 470, 479 (S.D. Tex. 1996).  These cases present far different circumstances than are

disclosed by this record.  In *Matagorda Ventures*, the plaintiff sued for a declaratory judgment that

its insurer, Travelers, was obligated to defend it in a trademark and copyright infringement lawsuit. 203 F.Supp.2d at 706.  After two years of proceedings, the expiration of the discovery deadline, and the filing of summary judgment motions, responses, and replies based on the pleadings, the insured sought leave to amend to assert a new claim based on Travelers's alleged to duty to defend an entirely separate lawsuit.  *Id.* at 720.  The court denied leave to amend because the plaintiff's claim for coverage in the second lawsuit raised a "distinct set of factual issues in a two-year old case which has, to this point, only involved the question of whether Travelers owes a duty to defend the [trademark and copyright] lawsuit."  *Id.*  The court in *Butschek* denied leave to amend because the plaintiff was attempting to "change his theory of the case after summary judgment motions [were] filed."  952 F.Supp. at 479.  In the present case, by contrast, Shippers's proposed amended answer and counterclaim do not raise a distinct set of factual issues.  Instead, the pleading relates to issue that have been part of this case at least since Glazier's deposition on February 28, 2008.  Shippers first moved to include these issues in the pleadings on March 27, 2008 when it sought leave to assert a fraud claim against Suzlon Wind.  The plaintiffs' contention that Shippers is seeking leave to amend only as an attempt to avoid summary judgment is belied by the fact that Shippers sought to assert the fraud by nondisclosure claim months before Suzlon Wind and Codan moved for summary judgment on their breach of contract claim.

Suzlon Wind and Codan argue that this court should deny Shippers leave to amend its answer and counterclaim because this court previously denied Shippers's motion for leave to amend its declaratory judgment complaint.  Suzlon Wind and Codan argue that Shippers's motion is a second attempt to obtain relief that this court already denied, and that the denial is the law of the case.  This argument is unpersuasive.  "Law of the case directs a court's discretion, it does not limit the

16

tribunal's power." *Arizona v. California*, 460 U.S. 605, 618, 103 S.Ct. 1382, 75 L.Ed.2d 318 (1983) (citations omitted).   "[I]n civil cases a district court is not precluded by the . . . doctrine from reconsidering previous rulings on interlocutory orders such as summary judgment motions, as those rulings are not immutable and lack *res judicata* effect." *United States v. Palmer*, 122 F.3d 215, 220 (5th Cir. 1997).  A ruling on a motion for leave to amend is an interlocutory order.  Moreover, this court's previous order did not deny the relief sought by the current motion for leave to amend Shippers's answer to assert the affirmative defenses contained in the proposed pleading, or for leave to amend to cure the lacking particularity in the earlier proposed pleading.  The law of the case doctrine is inapplicable.

Shippers's and ABR's motions for leave to amend are granted.

## III.   The Motions for Summary Judgment

### A.      The Legal Standard

Summary judgment is appropriate if no genuine issue of material fact exists and the moving party is entitled to judgment as a matter of law.  FED. R. CIV. P. 56(c).  "The movant bears the burden of identifying those portions of the record it believes demonstrate the absence of a genuine issue of material fact." *Lincoln Gen. Ins. Co. v. Reyna*, 401 F.3d 347, 349 (5th Cir. 2005) (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–25 (1986)).

If the burden of proof at trial lies with the nonmoving party, the movant may satisfy its initial burden by "'showing' – that is, pointing out to the district court – that there is an absence of evidence to support the nonmoving party's case." *See Celotex*, 477 U.S. at 325.  While the party moving for summary judgment must demonstrate the absence of a genuine issue of material fact, it does not need to negate the elements of the nonmovant's case. *Boudreaux v. Swift Transp. Co.*, 402

17

F.3d 536, 540 (5th Cir. 2005) (citation omitted). "'An issue is material if its resolution could affect the outcome of the action.'" *DIRECTV, Inc. v. Robson*, 420 F.3d 532, 536 (5th Cir. 2005) (quoting *Weeks Marine, Inc. v. Fireman's Fund Ins. Co.*, 340 F.3d 233, 235 (5th Cir. 2003)). "If the moving party fails to meet its initial burden, the motion for summary judgment must be denied, regardless of the nonmovant's response." *Quorum Health Res., L.L.C. v. Maverick County Hosp. Dist.*, 308 F.3d 451, 471 (5th Cir. 2002) (citing *Little v. Liquid Air Corp.*, 37 F.3d 1069, 1075 (5th Cir. 1994) (en banc)).

When the moving party has met its Rule 56(c) burden, the nonmoving party cannot survive a summary judgment motion by resting on the mere allegations of its pleadings. "[T]he nonmovant must identify specific evidence in the record and articulate the manner in which that evidence supports that party's claim." *Johnson v. Deep E. Tex. Reg'l Narcotics Trafficking Task Force*, 379 F.3d 293, 301 (5th Cir. 2004) (citation omitted). "This burden is not satisfied with 'some metaphysical doubt as to the material facts,' by 'conclusory allegations,' by 'unsubstantiated assertions,' or by 'only a 'scintilla' of evidence.'" *Little*, 37 F.3d at 1075 (internal citations omitted). In deciding a summary judgment motion, the court draws all reasonable inferences in the light most favorable to the nonmoving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) (citation omitted).

### B.    The Summary Judgment Record

The undisputed relevant summary judgment evidence includes the January 17, 2006 agreement between Suzlon Wind and Shippers;[3] excerpts of Port of Houston Authority Tariff No.

---

[3]  (Docket Entry No. 143, Ex. 1).

18

8;[4] the Port of Houston Authority Welding and Hot Work Permit;[5] National Fire Protection

Association Standard 51B, "Fire Prevention During Welding, Cutting, and Other Hot Work";[6] the

deposition of William Templet;[7] the deposition of Pablo Pineiro;[8] photographs of the damaged

nacelle;[9] the deposition of Kenneth Glazier;[10] the deposition of John Hewitt;[11] the deposition of

Lawrence Matta;[12] the deposition of Christopher Fuqua;[13] Suzlon Wind's "No-Hot-Work"

Mandatory Instruction memorandum dated November 11, 2005;[14] Suzlon Wind's nacelle foam-

removal procedure dated November 17, 2005;[15] a January 12, 2006 e-mail from Christensen to

Templet;[16] a January 14, 2006 e-mail from Hewitt to Glazier;[17] a January 17, 2006 e-mail from

---

[4]  (*Id.*, Ex. 6).

[5]  (*Id.*, Ex. 7).

[6]  (*Id*, Ex. 8).

[7]  (Docket Entry No. 153, Ex. E).

[8]  (*Id.*, Ex. F).

[9]  (Docket Entry No. 143, Ex. 2); (Docket Entry No. 156, Ex. 2).

[10]  (Docket Entry No. 153, Ex. A).

[11]  (Id., Ex. C).

[12]  (Docket Entry No. 167, Ex. 1).

[13]  (*Id.*, Ex. 2).

[14]  (Docket Entry No. 153, Ex. B).

[15]  (*Id.*, Ex. D).

[16]  (Docket Entry No. 158, Ex. J).

[17]  (*Id.*, Ex. I).

Christensen to Glazier;[18] Suzlon's postaccident memorandum dated January 23, 2006;[19] and a report by marine surveyor Rock O'Keefe.[20]

Shippers has moved to supplement the record with: (1) an e-mail exchange between Glazier and Dhakar about the report on the nacelle damaged in the October 25, 2005  fire;[21] (2) an e-mail showing that Glazier sent Templet the indemnity letter approximately 12 hours after he received the report from Dhakar;[22] and (3) correspondence between Suzlon Wind's counsel and Shippers's counsel confirming that Glazier received the Dhakar report on January 17, 2006.[23]  Suzlon Wind opposes the motion, arguing that evidence of Glazier's knowledge of the nacelle's flammability on January 17, 2006 is irrelevant to this court's determination of the breach of contract claim.  (Docket Entry No. 188).  Because Shippers's and ABR's motion for leave to amend is granted, Suzlon Wind's objection is moot.  The evidence is relevant to the affirmative defense of fraudulent inducement and counterclaim of fraud by nondisclosure.  Shippers's motion to supplement the summary judgment record, (Docket Entry No. 184), is granted.

**C.    The Cross-Motions for Summary Judgment on the Plaintiffs' Breach of Contract Claim**

Suzlon Wind and Codan argue that Shippers breached its January 17, 2006 letter agreement

---

[18]  (*Id.*, Ex. K).

[19]  (Docket Entry No. 153, Ex. H).

[20]  (Docket Entry No. 158, Ex. L).

[21]  (Docket Entry No. 184, Ex. O).

[22]  (*Id.*, Ex. P).

[23]  (*Id.*, Ex. Q).

to provide hot work by failing to use "careful fire precautions" and by failing to adhere to "other customary good practices and/or fire-prevention procedures." Specifically, Suzlon Wind and Codan contend that Shippers's failure to follow the requirements of Port of Houston Tariff No. 8 Subrule No. 54, Section 10 ("Subrule No. 54") and National Fire Protection Association Standard 51B ("NFPA 51B") breached the letter agreement provision requiring use of "careful fire precautions" and "other customary good practices and/or fire-prevention procedures." Shippers responds that the contract terms "careful fire precautions" and "other customary good practices and/or fire prevention procedures" are ambiguous. Shippers argues that there was no meeting of the minds and no enforceable contract because "Shippers did not agree to the referenced tariff and standard as a clause, term, or definition of the alleged contract." (Docket Entry No. 158, at 21). Shippers also argues that it was wrongfully induced to enter into the contract because Suzlon Wind failed to disclose the previous nacelle fires, the no-hot-work instruction, and the foam-removal procedure. Shippers has cross-moved for summary judgment on the plaintiffs' breach of contract claim on these grounds.

The elements of a breach of contract cause of action are: (1) the existence of a valid contract; (2) performance or tendered performance by the plaintiff; (3) breach of the contract by the defendant; and (4) damages sustained by the plaintiff as a result of the breach. *Smith Intern.*, *Inc. v. Egle Group*, *LLC*, 490 F.3d 380, 387 (5th Cir. 2007). The elements of a valid contract are: (1) an offer; (2) an acceptance; (3) a meeting of the minds; (4) each party's consent to the terms; and (5) execution and delivery of the contract with the intent that it be mutual and binding. *Roman v. Roman*, 193 S.W.3d 40, 50 (Tex.App.– Houston [1st Dist.] 2006, pet. denied).

### 1.    Ambiguity and a Meeting of Minds

Shippers argues that "careful fire precautions" and "other customary good practices and fire prevention procedures" are undefined and subject to more than one reasonable interpretation. Rock O'Keefe, a surveyor hired by Suzlon Wind, wrote a report after the fire. He noted that "a fire blanket was used in between the shipping stand and the nacelle cover and three (3) fire extinguishers were on hand" and concluded that "[f]rom our review, we are satisfied that reasonable precautions were taken." (Docket Entry No. 158, Ex. L). Pablo Pineiro testified that he felt he was following good practices and procedures by using a fire blanket and fire extinguishers. (Docket Entry No. 153, Ex. F, Pineiro Deposition at 74:15-18). Shippers points to the deposition testimony of Suzlon's expert witness, Lawrence Matta, that the term "customary good practices" is not a defined term in the welding regulations and that he "hasn't heard that as a term specifying anything in particular." (Docket Entry No. 167, Ex. 1, Matta Deposition at 307:1-15). Shippers contends that there was no meeting of the minds because there was no agreement as to the scope of these terms. Shippers points to Templet's deposition testimony that "my understanding of our conversation was that, if we had the fire blankets and fire extinguishers, this is what Suzlon requested that we have." (Docket Entry No. 153, Ex. E, Templet Deposition at 17:18-21). Shippers asserts that the letter agreement does not "incorporate any specific tariffs or standards," and "Shippers did not agree to incorporate any tariffs or standards." (Docket Entry No. 158, at 21).

Suzlon Wind and Codan contend that the contract terms at issue are not ambiguous. They argue that adhering to required applicable regulations and industry standards, including Subrule No. 54 and NFPA 51B, necessarily falls within "careful fire precautions" and "other customary good practices and fire prevention procedures." Suzlon Wind and Codan point to Matta's deposition testimony that a "welder should have been aware" of these standards. Suzlon Wind and Codan

22

argue that the contract terms are unambiguous and a meeting of the minds occurred.

What a contract means, and whether a contract is ambiguous, are questions of law for the court. *Heritage Res.*, *Inc. v. NationsBank*, 939 S.W.2d 118, 121 (Tex. 1996). If the contract can be given a certain or definite legal meaning or interpretation, then it is not ambiguous, and a court should construe the contract as a matter of law. *SAS Inst.*, *Inc. v. Breitenfeld*, 167 S.W.3d 840, 841 (Tex. 2005). A court should construe an unambiguous contract according to the plain meaning of its express words. *Lyons v. Montgomery*, 701 S.W.2d 641, 643 (Tex. 1985). Unambiguous contracts are enforced as written. *Heritage*, 939 S.W.2d at 121.

A contract is ambiguous when its meaning is uncertain and doubtful or is reasonably susceptible to more than one interpretation. *Heritage*, 939 S.W.2d at 121. An ambiguity does not arise simply because the parties offer opposing interpretations. *Lopez v. Munoz*, *Hockema & Reed*, *L.L.P.*, 22 S.W.3d 857, 861 (Tex. 2000). A court determines whether a contract is ambiguous by looking at the contract as a whole in light of the circumstances present when the parties entered the contract. *Universal Health Servs.*, *Inc. v. Renaissance Women's Group*, *P.A.*, 121 S.W.3d 742, 746 (Tex. 2003). Parol evidence is not admissible for the purpose of creating an ambiguity. *See Universal C.I.T. Credit Corp. v. Daniel*, 150 Tex. 513, 517, 243 S.W.2d 154, 157 (Tex. 1951); *Lewis v. E. Tex. Fin. Co.*, 136 Tex. 149, 146 S.W.2d 977, 980 (1941). If a contract is determined to be ambiguous, then a court may consider extraneous evidence to ascertain the true meaning of the instrument. *Nat'l Union Fire Ins. Co. v. CBI Indus.*, *Inc.*, 907 S.W.2d 517, 520 (Tex. 1995). The meaning of an ambiguous contract is a question of fact. *Harris v. Rowe*, 593 S.W.2d 303, 306 (Tex. 1980).

"The law existing at the time a contract is made becomes a part of the contract and governs

the transaction." *Wessely Energy Corp. v. Jennings*, 736 S.W.2d 624, 626 (Tex. 1987); *see also*

*Central Educ. Agency v. George West Indep. School Dist.*, 783 S.W.2d 200, 202 (Tex. 1989) ("Laws

which subsist at the time and place of the making of a contract . . . enter into and form a part of it,

as if they were expressly referred to or incorporated in its terms.") (internal citations omitted)).

"Courts presume that the parties to a contract knew and took into consideration the laws affecting

matters about which they contracted, unless the contrary clearly appears in the terms of the

contract." *Jamestown Partners*, *L.P. v. City of Fort Worth*, 83 S.W.3d 376, 381 (Tex. App. – Fort

Worth 2002, pet. denied).

Port of Houston Tariff No. 8, Subrule No. 54, Section 10, titled "Preventing, Detecting,

Controlling, and Fighting of Fires," applied to the hot work at issue.  (Docket Entry No. 143, Ex.

6).  Subrule No. 54 applies to "all Users and all facilities within the jurisdiction of the Port

Authority, including but not limited to piers, wharves, landings, buildings, or other structures

adjacent to such waterways or utilized by the Port Authority in providing services."  (*Id.*, Ex. 6 at

9).  Tariff No. 8 defines "Users" to include stevedores and their "agents, servants, representatives,

and/or employees."  In the section titled "Scope," Subrule No. 54 states that "[a]ll ordinances, rules

and regulations issued by the Port Authority relative to Fire Protection shall, in the event of conflict,

take precedence over local or state law . . . but if there is no conflict, all such provisions, ordinances,

rules, and regulations shall apply and shall be in addition to the ordinances, rules, and regulations

of the Port Authority."  (*Id.*).  With respect to welding or hot work, Subrule No. 54, Section 10

provides:

> Oxyacetylene, electric, or any other welding or burning or other "hot
> work" within the territorial jurisdiction of the Port Authority as set
> out in these regulations is permitted subject to the conditions set out
> herein and provided that a current permit issued by the USCG

> Captain of the Port is in the possession of the person on the job in charge of the operation and a permit has been issued by the Port Authority. . . . When welding, burning or other hot work is being performed, positive means shall be taken to confine heat, sparks, or slag so as to protect immovable fire hazards.  Suitable operable fire extinguishing equipment shall be in the immediate vicinity and ready for instant use.

(Docket Entry No. 143, Ex. 6 at 9).

The welding and hot-work permit that the Port of Houston Authority required for such work stated that the following steps must be taken: (1) an inspection of the area and adjoining areas performed by the welding foreman or operator in charge before beginning the hot work; (2) maintaining a competent fire watch; and that (3) "[a]ll safe practices, local laws and ordinances shall be observed (See National Fire Code 51B)."  (Docket Entry No. 143, Ex. 7).  Welding and hot-work permits issued by the Port of Houston require that "all safe practices" be observed and incorporate NFPA 51B as the standard for those practices.  An individual or entity performing hot work in the Port of Houston is required by Tariff No. 8, Subrule 54, Section 10 to observe NFPA 51B.  NFPA 51B requires, among other things, that: (1) the hot work be performed in either a designated or permissible area; (2) the entity entrusted with management of the hot-work operations designate a permit authorizing individual ("PAI"); (3) the PAI obtains a hot-work permit; (4) the PAI determines any potential fire hazards associated with the hot work; (5) the PAI ensures any combustibles are properly shielded against ignition; (6) the PAI determines that fire protection and extinguishing equipment is properly located at the situs for hot work; (7) the PAI ensures the presence of at least one fire watch; (8) the fire watch ensures that safe conditions are maintained at the hot-work site; (9) the fire watch is authorized to stop hot-work operations; and (10) the fire watch has extinguishers readily available and is trained in their use.  (Docket Entry No. 143, Ex. 8).

25

The contract between Suzlon Wind and Shippers is not ambiguous. The contract states that "careful fire precautions are necessary" and that Shippers "must use fire blankets to cover the nacelles, have fire extinguishers available, and adhere to other customary good practices and fire prevention procedures." (Docket Entry No. 143, Ex. 1). The parties intended Shippers to follow the applicable law and fire-protection standards for doing the hot work at issue. The applicable law and fire-protection standards, Subrule No. 54 and NFPA 51B, are part of the laws existing when the agreement was formed.

For a contract to be enforceable, "the minds of the parties must meet with respect to the subject matter of the agreement and all its essential terms." *Weynand v. Weynand*, 990 S.W.2d 843, 846 (Tex.App.– Dallas, 1999, pet. denied). Whether there was a meeting of the minds, and thus an offer and acceptance, is determined based on what the parties said and did, not on a subjective standard. *Copeland v. Alsobrook*, 3 S.W.3d 598, 604 (Tex.App.– San Antonio 1999, pet. denied). There must be a clear offer and, in turn, a definite acceptance of the terms contained in the offer. *Harris v. Balderas*, 27 S.W.3d 71, 77 (Tex.App.– San Antonio 2000, pet. denied). The record shows a clear offer and acceptance of the terms of the January 17, 2006 agreement, which is not ambiguous. The agreement's terms include that Shippers would follow the applicable regulations and standards for performing the hot work. Templet's subjective understanding of what Suzlon Wind meant by "careful precautions" and "other customary good practices and fire prevention procedures" does not create a fact issue as to whether there was a meeting of the minds.

It is undisputed that Shippers did not follow Subrule No. 54 and NFPA 51B. Shippers did not obtain a hot-work permit. (Docket Entry No. 143, Ex. 3, Templet Deposition at 44:9-13). Shippers did not formally designate anyone as a PAI. (*Id.*, at 44:6-19). Templet testified that he was

26

the person at Shippers in charge of authorizing hot-work permits.  (*Id.*, at 18:17-19, 43:10-44:4).
Templet did not know whether the hot work at issue was performed in a designated or permissible
area;[24] did not inspect the work site;[25] did not ensure that the hot-work site was free of combustible
or flammable contents;[26] and did not ensure the presence of a fire watch.[27]

Shippers's failure to follow the requirements of Subrule No. 54 and NFPA 51B is a breach
of the agreement to "adhere to other customary good practices and fire prevention procedures."
However, summary judgment on the breach of contract claim is unwarranted because Shippers has
raised a disputed fact issue material to determining whether the contract is unenforceable based on
fraudulent inducement.

### 2.      Fraudulent Inducement

Shippers argues fraudulent inducement based on Suzlon Wind's failure to disclose the
flammability of the insulation, the previous nacelle fires, and the no-hot-work instruction and foam-
removal procedure.  Suzlon Wind responds that the January 17, 2006 letter agreement states that
careful fire precautions would be needed because the hot work would be close to the nacelles.
Suzlon Wind argues that it had no duty to made additional disclosures about the flammable nature
of the nacelles's foam interior because that danger was "open and obvious."

A party fraudulently induced to consent to a contract is not bound by the contract's terms and
may rescind the entire contract. *See*, *e.g.*, *Formosa Plastics Corp. v. Presidio Eng'rs & Contractors*,

---

[24]    (Docket Entry No. 143, Ex. 3, Templet Deposition at 46:16-47:6).

[25]    (*Id.*, at 54:12-55:3).

[26]    (*Id.*, at 48:2-23).

[27]    (*Id.*, at 54:9-11).

*Inc.*, 960 S.W.2d 41, 47 (Tex. 1998) (a party is not bound by a contract procured by fraud); *Prudential Ins. Co. of Am. v. Jefferson Assocs.*, *Ltd.*, 896 S.W.2d 156, 162 (Tex. 1995) (a buyer is not bound by an agreement to purchase that it was fraudulently induced to execute); *Lyn-Lea Travel Corp. v. American Airlines*, Inc., 283 F.3d 282, 289 (5th Cir. 2002) ("A fraudulently induced party has not assented to an agreement because the fraudulent conduct precludes the requisite mutual assent."). The elements of fraudulent inducement are the same for common-law fraud. *DeSantis v. Wackenhut Corp.*, 793 S.W.2d 670, 688 (Tex. 1990). "The elements of fraud are a material misrepresentation, which was false, and which was either known to be false when made or was asserted without knowledge of the truth, which was intended to be acted upon, which was relied upon, and which caused injury." *Johnson & Higgins of Texas*, *Inc. v. Kenneco Energy*, *Inc.*, 962 S.W.2d 507, 524 (Tex. 1998). To establish fraudulent inducement, a party must show more than ordinary detrimental reliance. *See Haase v. Glazner*, 62 S.W.3d 795, 798 (Tex. 2001).

Fraud can be by either misrepresentation or passive silence. *Santanna Natural Gas Corp. v. Hamon Operating Co.*, 954 S.W.2d 885, 890 (Tex.App.– Austin 1997, pet. denied). As a general rule, a failure to disclose information is not fraudulent unless there is a duty to disclose the information. *Bradford v. Vento*, 48 S.W.3d 749, 755 (Tex. 2001). Silence is a false representation only when the circumstances impose a duty on the party to speak and he deliberately remains silent. *Id.* Texas courts have held that a duty to disclose information may arise in an arm's-length business transaction when a party makes a partial disclosure that, although true, conveys a false impression. *See*, *e.g.*, *Citizens Nat'l Bank v. Allen Rae Invs.*, 142 S.W.3d 459, 476-77 (Tex.App.– Fort Worth 2004, no pet.)*; Hoggett v. Brown*, 971 S.W.2d 472, 487 (Tex.App.– Houston [14th Dist.] 1997, no writ); *Ralston Purina Co. v. McKendrick*, 850 S.W.2d 629, 633 (Tex.App.– San Antonio 1993, writ

denied).   Courts have also held that voluntarily disclosing some information creates a duty to disclose the whole truth.  *Anderson*, *Greenwood & Co. v. Martin*, 44 S.W.3d 200, 212-13 (Tex. App. – Houston [14th Dist.] 2001, pet. denied).   Whether such a legal duty exists is a question of law. *Bradford*, 48 S.W.3d at 755.   In deciding whether a legal duty exists, courts consider "whether one party generally had superior knowledge of the risk in question."  *Humble Sand & Gravel*, *Inc. v. Gomez*, 146 S.W.3d 170, 182 (Tex. 2004).

The facts of *Bradford* and *Citizens Nat'l Bank* are instructive.  *Bradford* involved a fraud claim asserted by an individual, Vento, about purchasing a shop from Taylor.  48 S.W.3d at 752-54. Taylor had signed successive short-term leases in the mall where the store was located.  Bradford was the mall's property manager.  *Id.* at 752.  After purchasing the shop from Taylor – or so he thought –  Vento went to Bradford's office, paid the shop's rent for October, informed Bradford that he had purchased the store, and asked about a long-term lease.  *Id.*  Bradford congratulated Vento on the purchase, indicated that he had heard about it, informed Vento that the monthly rent was a "decent deal," suggested that a long-term lease was a bad idea, and said that he would "take care of" Vento in January.  *Id.*  Bradford did not mention that the store's lease was nonassignable, that additional rent would be due in December, and that Vento would be required to apply for a new lease.  *Id.*  Taylor subsequently told Bradford that he still owned the store and that there could be "trouble."  *Id.* at 752-53.  Bradford alerted mall security and Vento was asked to leave the mall because he could not prove that he owned the store.  *Id.* at 753. Vento sued Bradford, among others, for fraud.  *Id.*

The jury found for Vento on the fraud claim and the appellate court upheld that verdict.  The court concluded that Bradford's "failure to disclose pertinent information regarding the procedures

for obtaining a new lease constituted a partial disclosure which conveyed a false impression." *Id.* at 755. The false impression included that no rent increase would occur until January and that executing a new lease was a mere formality. *Id.* The Texas Supreme Court reversed, holding that there was no evidence that Bradford knew Vento was ignorant of a material fact or that Vento did not have an equal opportunity to discover the truth. Even though Vento claimed to have purchased the store, he never asked Bradford about the terms of the lease, for a copy of the lease, or about the rent for the rest of the year. *Id.* at 756. There was "no evidence that Bradford knew that Vento had not obtained or could not obtain the information from other sources, such as Taylor, from whom Vento was buying the store." *Id.* at 755-56.

In *Citizens Nat'l Bank*, a borrower sued a bank's business development officer for fraud based on his failure to disclose material information. 142 S.W.3d at 468. The officer, Lawson, attended a business presentation for Bed & Bath Inns, Inc., a company in which some of the bank's clients were investing as franchisees. *Id.* One week later, Ruth Ann of Allen Rae Investments, Inc. ("ARI"), sought a loan from the bank to finance construction of a motel project. *Id.* Ruth Ann met with Lawson, who informed her that the bank could not finance ARI's motel project with only a ten percent down payment. *Id.* Without disclosing his doubts about the Bed & Bath sales pitch or the bank's prior relationship with Bed & Bath, Lawson told Ruth Ann about the Bed & Bath investment opportunity, gave her the brochure he had received the week before, and told her that the investment was a "good deal" and that the bank would give ARI a U.S. Small Business Administration loan for the Bed & Bath project but not for any other project. *Id.* at 468-69.

ARI agreed to proceed with the Bed & Bath project. The bank then tried to obtain required financial information from Bed & Bath. *Id.* at 469. Bed & Bath did not comply. Lawson wrote Bed

30

& Bath a letter stating that the bank "could be on the verge of losing a deal we switched from [the motel project] to you because of the delay." *Id.* After Bed & Bath still did not provide the information, the bank sent them another letter stating that it would not go forward on any other Bed & Bath project and that it would not recommend any other Bed & Bath projects to its customers. *Id.* All this occurred before ARI closed on its Bed & Bath project. Ruth Ann testified that ARI would not have gone forward with the project had she known that the bank was not going to recommend that any other customers proceed. *Id.* at 478.

Before ARI agreed to proceed, Lawson did not disclose the bank's "prior relationship with Bed & Bath, his ambivalence about Bed & Bath's ability to deliver on the profits it promised to [the bank] from their business relationship, or the fact that neither [the bank] nor he himself had investigate Bed & Bath's financial condition." *Id.* at 477. The court held that Lawson had a duty to disclose this information because he had voluntarily provided some information and was therefore obligated to disclose the complete picture. *Id.* The court held that after ARI went forward with the project, Lawson had a duty to disclose that the bank was losing enthusiasm, was not getting financial information from Bed & Bath, and was specifically not recommending the investment to other bank customers. The failure to disclose this information created a false impression that induced ARI to continue with the loan and project. *Id.*

In the present case, Suzlon Wind argues that it did not have a duty to disclose the flammability of the foam insulation inside the nacelle because that danger was "open and obvious." There is generally no duty to disclose a fact that the other party knew or should have known. *See Terry v. Mercedes-Benz*, No. 05-06-00118-cv, 2007 WL 2045231, at *3 (Tex. App. – Dallas 2007, no pet.). Suzlon Wind asserts that the danger was obvious because the area where Pineiro was

cutting holes in the shipping stands was within 16 inches of the foam insulation inside the nacelle. Suzlon Wind contends that Pineiro should have known about the foam insulation because he should have conducted an inspection to determine whether combustible materials were close to the hot work he was going to do.  Suzlon Wind points to the deposition testimony of Haskell Simpkins, an engineer it designated as an expert witness, that an individual performing hot work near a nacelle would have been able to "see a considerable amount of the interior" from the front of the nacelle and would have had "access to the interior where [he] could climb in and do a very complete inspection of what's inside the nacelle."  (Docket Entry No. 171, at 5).  Suzlon Wind asserts that "[p]olyurethane foam, if not known, must be assumed to be flammable."  (*Id.*).

Shippers responds that Glazier's January 17, 2006 letter created "a false impression that hot work could be safely undertaken on the nacelle" if Shippers used standard "careful fire precautions" and "other customary good practices and fire prevention procedures" (Docket Entry No. 153, at 16). Pineiro testified that he could not see into the nacelle's interior before he began the welding. (Docket Entry No. 143 Ex. 5, Pineiro Deposition at 73:9-15).  Shippers asserts that Suzlon Wind had superior knowledge of the danger posed by the foam insulation because it knew that the insulation had been ignited in the two recent nacelle fires as a result of hot work conducted nearby.  According to Shippers, these previous fires "demonstrate that the flammability of the insulation was not 'open and obvious.'"  (Docket Entry No. 167, at 6).  Shippers points to the deposition testimony of Lawrence Matta, a fire investigator designated as an expert witness by Suzlon Wind.  Matta testified that although polyurethane foam insulation is often treated with flame retardant, the insulation in the nacelle at issue was not.  (Docket Entry No. 167, Ex. 1, Matta Deposition at 155:21-25, 157:10-12).  There is no apparent visual difference between treated and nontreated insulation.  (*Id.*, at

271:13-17).  Matta testified that had he known of the two prior nacelle fires, the no-hot-work instruction, and the foam-removal procedure, he would have informed Shippers of these facts before they began the hot work.  (*Id.*, at 286:21-287:12).  There are fact issues material to determining whether the presence of flammable foam insulation was an "open and obvious" fire danger.

Suzlon Wind cites *Terry v. Mercedes-Benz*, 2007 WL 2045231, at *3, to support its argument.  In that case, several individuals who bought or leased a Mercedes-Benz car with a low-profile design sued the manufacturer for fraudulent failure to disclose.  2007 WL 2045231, at *1. They alleged that Mercedes-Benz did not tell them that "the front bumper was designed to be so low to the ground that it would hit common curbs and wheel stops."  *Id.*  The court concluded that Mercedes-Benz did not have a duty to disclose because "the height of the bumper was not concealed."  *Id.* at *3.  The plaintiffs had "no right to be informed" that the bumper could hit curbs or wheel stops because the plaintiffs "knew, or certainly should have known, that the bumper had a minimum clearance of some amount."  *Id.*  "That [the bumper] could be damaged if it came into contact with an object higher than its minimum clearance is they type of information that any person driving an automobile is expected to know."  *Id.*  The court concluded that no duty to disclose existed because there was no evidence that plaintiffs "did not have an equal opportunity to discover this information."  *Id.*

In the present case, unlike the easily visible low-bumper in *Terry*, the high flammability of the nacelle was not so open and obvious as to allow a court to reach that conclusion as a matter of law.  Pineiro testified that he could not see inside the nacelle before he began the work and he did not know the material used.  There is a fact issue as to whether and to what extent the danger of highly flammable material in a readily ignitable area was evident.  Suzlon Wind's failure to disclose

the information it had about the recent nacelle fires resulting from hot work, the no-hot-work instruction and the foam-removal policy created a false impression about whether hot work could be safely done on the nacelle's shipping stands.  Suzlon Wind hired Shippers to perform hot work and did not disclose its own recent directive to stop doing hot work around nacelles or that it had begun removing foam insulation from the nacelles.  Unlike the position of the plaintiff in *Bradford*, Shippers did not have an equal opportunity to discover this withheld information.  There is no evidence that Shippers had or could have obtained this information from another source or that Shippers could be "expected to know" this information merely because it agreed to perform hot work on the nacelles.  Much like the officer in *Citizens Nat'l Bank* had a duty to disclose that the bank was no longer recommending the investment to its customers, Suzlon Wind had a duty to disclose that it had ceased all hot work around nacelles and had begun removing the foam insulation from its nacelles.  The information that Suzlon Wind did not disclose was necessary to provide a full picture of the dangers involved in doing the hot work on a nacelle and would be important to an individual or entity undertaking such work.  *See Citizens Nat'l Bank*, 142 S.W.3d at 478-79 ("'Material information' is that which a reasonable person would attach importance to and would be induced to act on in determining his choice of actions in the transaction in question.").

Suzlon Wind asserts that it assumed that Shippers knew about the previous fires and the flammability of the insulation because of the request for an indemnity letter.  However, it was Suzlon Wind's own agent, Christensen of PLI, who first suggested the hold harmless letter to Templet, the Shippers Operations Manager.  Only hours before Glazier spoke with Templet about the hot work on the nacelle and the terms of the indemnity letter, Glazier had received the report stating that the *BBC Canada* fire had begun when foam insulation inside the nacelle ignited.  Glazier

was aware of the flammability of the insulation and the specific risks involved in performing hot work on a nacelle, but he did not disclose this information when he hired Shippers to do the hot work.

The record discloses fact issues as to whether Suzlon Wind fraudulently induced Shippers to enter the letter agreement.  The plaintiffs' motion for summary judgment on the breach of contract claim is denied.  Shippers's cross-motion for summary judgment on the plaintiffs' breach of contract claim is also denied.

> ### D.   Shippers's and ABR's Motions for Summary Judgment on the Plaintiffs' Negligence *Per Se* Claim

Shippers and ABR assert that they are entitled to judgment as a matter of law on the plaintiffs' negligence *per se* claim.  The third amended complaint states that "Defendants are also liable for Plaintiffs' damages in negligence *per se* for their violation of Port of Houston Tariff No. 8, Section Two, Subrule No. 54, and the provisions of NFPA 51.B."  (Docket Entry No. 139).

According to Shippers and ABR, the plaintiffs "appear to contend" that Port of Houston Tariff No. 8 Subrule No. 54, Section 10 incorporates 49 C.F.R. § 176.54 and 33 C.F.R. § 126.15(c), which incorporate by reference NFPA 51B.  This assertion is incorrect.  The OSHA regulations are set out at 29 C.F.R. §§ 1900-1999.  The regulations referred to in Subrule No. 54, Section 10 – 49 C.F.R. § 176.54 and 33 C.F.R. § 126.15(c) – were not promulgated under OSHA.  Moreover, Suzlon Wind and Codan "do not contend that they possess an implied cause of action" based on Subrule No. 54's incorporation of 46 C.F.R. § 176.54 and 33 C.F.R. § 126.15(c).  (Docket Entry No. 174, at 12).  Rather, Suzlon Wind and Codan argue that the conduct of Shippers and ABR in violation of Tariff No. 8 itself is negligence *per se*.  (*Id.*).  In response to the motions for summary judgment filed by Shippers and ABR, Suzlon Wind and Codan have refined their argument and do not contend that

a violation of NFPA 51B is negligence *per se*.

If negligence *per se* applies, the elements of duty and breach are satisfied by proof that the defendant has violated a statute. *Smith v. Merritt*, 940 S.W.2d 602, 607 (Tex. 1997). The jury is not asked to decide whether the defendant acted as a reasonably prudent person would have under the same or similar circumstances because the statute itself states what a reasonably prudent person would have done. *Supreme Beef Packers, Inc. v. Maddox*, 67 S.W.3d 453, 455 (Tex.App.-Texarkana 2002, pet. denied). If the defendant does not raise an excuse, the only inquiry for the jury is whether the defendant violated the statute and, if so, whether the violation was a proximate cause of the injury. *Id.* An administrative regulation may also form the basis of a negligence *per se* claim. *Freudiger v. Keller*, 104 S.W.3d 294, 296 (Tex.App.– Texarkana 2003, pet. denied). However, "courts have tended to adopt administrative standards less frequently than those of legislative enactments." RESTATEMENT 2D TORTS § 286, comment d (1965).

The threshold questions in a negligence *per se* case are whether the plaintiff belongs to the class that the statute was intended to protect and whether the plaintiff's injury is of a type that the statute was designed to prevent. *Perry v. S.N.*, 973 S.W.2d 301, 305 (Tex. 1998). The Port of Houston Authority issued Subrule No. 54 under the authority delegated by the Texas Legislature to "promulgate and enforce ordinances, rules and regulations." (Docket Entry No. 143, Ex. 6). The purpose of Subrule No. 54 is to promote "the safety of life and property on or adjacent to the waterways, channels and turning basins within [the Port of Houston Authority's] jurisdiction . . . from damages by fire and explosion thereon." (Docket Entry No. 143, Ex. 6). Subrule No. 54 is designed to prevent injury, death, or property damage from fire or explosion at the Port of Houston. It is intended to protect property owners, like Suzlon Wind, from having property located at the Port

damaged or destroyed by fire or explosion.

Even though Subrule No. 54 was designed in part to protect parties such as Suzlon Wind from damage to its property such as occurred as a result of the nacelle fire, this court must still determine whether it is appropriate to impose tort liability for a violation of that regulation.  In *Perry*, the Texas Supreme Court listed five factors for a court to consider in determining whether a statute or regulation is an appropriate basis for a negligence *per se* claim. *Id.* at 309.  Those factors are: (1) whether the regulations are the sole source of any tort duty from the defendant to the plaintiff or merely supply a standard of conduct for an existing common-law duty; (2) whether the regulations put the public on notice by clearly defining the required conduct; (3) whether the regulations would impose liability without fault; (4) whether negligence *per se* would result in ruinous damages disproportionate to the seriousness of the regulatory violation, particularly if the liability would fall on a broad and wide range of collateral wrongdoers; and (5) whether the plaintiff's injury is a direct or indirect result of the violation of the regulations. *Id.*  "These factors are not necessarily exclusive, nor is the issue properly resolved by merely counting how many factors lean each way." *Id.* at 306**.**  Rather, they are guidelines to assist courts in determining the ultimate question of whether imposing tort liability for a violation of a statute is "fair, workable, and wise." *Id.*; *Ordonez v. M.W. McCurdy & Co., Inc.*, 984 S.W.2d 264, 268 (Tex. App. – Houston [1st Dist.] 1998, no pet.).

Subrule No. 54 does not create a new tort duty.  Rather, it provides guidance as to what conduct could breach the existing common-law duty to act with reasonable prudence.  Adopting Subrule No. 54 as the standard of care for welding and hot work in the Port of Houston would not impose liability without fault because the failure to comply with fire-prevention measures requires

a lack of due care.  The rule does not impose liability on a broad and wide range of collateral wrongdoers because Subrule No. 54, Section 10 is restricted to welders and individuals performing hot work within the Port of Houston.

On the question of notice, Subrule No. 54, Section 10 clearly states that hot work may be performed within the Port of Houston "provided that a current permit" has been "issued by the Port Authority."  (Docket Entry No. 143, Ex. 6).  Suzlon Wind and Codan allege that Shippers and ABR failed to obtain a hot-work permit.  However, the failure to obtain a hot-work permit was not the direct cause of the nacelle fire.  The specific actions that the plaintiffs allege Shippers and ABR failed to do that caused the fire – conduct an inspection, use adequate fire blankets and fire extinguishers, post a fire watch, and clear combustible materials from the area – are not found in the text of Tariff No. 8, Subrule No. 54, Section 10.  Instead, these specific required fire-prevention procedures are listed in the hot-work permit.

The notice inquiry for negligence *per se* is whether the *statute* or *regulation* clearly defines the required conduct.  The text of Tariff No. 8, Subrule No. 54, Section 10 does not specifically define what safety precautions and fire-prevention procedures are required in every case.  Neither does it expressly incorporate by reference the requirements listed on the hot-work permit.  The relevant portion of Section 10 provides that "[w]hen welding, burning or other hot work is being performed, positive means shall be taken to confine heat, sparks, or slag so as to protect immovable fire hazards.  Suitable operable fire extinguishing equipment shall be in the immediate vicinity and ready for instant use."  (Docket Entry No. 143, Ex. 6).  The rule does not define or specify the "positive means" that must be taken to confine heat, sparks, or slag.  What steps "positive means" requires will vary by circumstance and situation.  Subrule No. 54, Section 10 does not put the

relevant part of the public – the welders and individuals performing hot work in the Port of Houston – on notice of precisely what conduct is required to perform hot work in any particular case. *Compare Omega Contracting*, *Inc. v. Torres*, 191 S.W.3d 828, 840-41 (Tex. App. – Fort Worth 2006, no pet.) (finding negligence *per se* inapplicable because regulation which stated "nuts or bolts shall not be missing or loose" did not define "loose" nor "specify any particular amount of torque" and did not put the public on notice of required conduct), with *Osti v. Saylors*, 991 S.W.2d 322, 328 (Tex. App. – Houston [1 Dist.] 1999, pet. denied) (finding that negligence *per se* applied because the building code's requirement that "every floor above the first story used for human occupancy shall have access to at least two separate exits, one of which may be an exterior fire escape" was a clear definition of required conduct that put the public on notice).

"[W]he[n] a statute incorporates the ordinarily prudent person standard, negligence *per se* does not apply because the statute does not establish a specific standard of conduct different from the common-law ordinary standard of care." *Supreme Beef Packers*, 67 S.W.3d at 456. In *Supreme Beef Packers*, the court held that negligence *per se* did not apply to several regulations involving electrical safety. *Id.* at 457. One of the regulations, 29 C.F.R. § 1910.303(b)(1), stated: "Examination. Electrical equipment shall be free from recognized hazards that are likely to cause death or serious physical harm to employees." The court held that the regulations were not an appropriate basis for negligence *per se* because "[t]here is obviously no clearly-defined standard of conduct specified here. Determining what is or is not safe in these circumstances bears practically no difference from determining what is or is not reasonable." *Supreme Beef Packers*, 67 S.W.3d at 458.

Subrule No. 54, Section 10 requires that an individual performing hot work take "positive

means . . . to confine heat, sparks, or slag so as to protect immovable fire hazards," and that "suitable" fire extinguishing equipment is to be nearby.   (Docket Entry No. 143, Ex. 6). Determining what is or is not an appropriate "positive means" to protect against fire hazards or "suitable" fire extinguishing equipment under this rule "bears practically no difference from determining what is or is not reasonable."  Tariff No. 8, Subrule No. 54, Section 10 is not an appropriate basis for a negligence *per se* jury instruction.  The motions for partial summary judgment filed by Shippers and ABR on the plaintiffs' negligence *per se* claim are granted.

### E.   ABR's Motion for Summary Judgment on the Plaintiffs' Claims for Breach of Contract and Implied Warranty and on the *Res Ipsa Loquitur* Theory of Liability

In their third amended complaint, Suzlon Wind and Codan allege that the nacelle fire was caused by "the acts or failure to act of the Defendants herein, which acts or failure  to act constitute negligence, breach of contract or [sic] carriage, breach of warehouseman's duties, breach of contract of bailment, and/or breach of implied and/or express warranties on the part of one or more of the Defendants while the Nacelle was under the care or custody of each such Defendant."  (Docket Entry No. 139, at 3).  Suzlon Wind and Codan also assert that "[n]egligence on the part of the Defendants should be inferred in this case pursuant to the doctrine of *res ipsa loquitur*."  (*Id.*).  ABR moved for summary judgment dismissing the plaintiffs' claims for breach of contract and implied warranty and the plaintiffs' *res ipsa* liability theory.

### 1.   Breach of Contract

ABR argues that the plaintiffs cannot maintain their cause of action for breach of contract because Suzlon Wind had no contract with ABR.  *See Williams*, 264 S.W.3d at 235 (an essential element of a breach of contract claim is the existence of a valid contract).  Suzlon Wind and Codan

admit that there was no express contract with ABR but contend that an implied contract of bailment between Suzlon Wind and ABR precludes summary judgment.

A bailment relationship does not create a specific cause of action but instead allows the bailor to choose the form of relief for breach, such as an action for breach of contract or an action for conversion. *See International Freight Forwarding*, *Inc. v. American Flange*, 993 S.W.2d 262, 269 (Tex.App.– San Antonio 1999, no pet.); *see also Prime Products*, 97 S.W.3d at 638 (a bailment claim is not a separate cause of action from a breach of contract claim). A bailment relationship generally requires: (1) a contract, either express or implied; (2) delivery of property to the bailee; and (3) acceptance of the property by the bailee. *Russell v. American Real Estate Corporation*, 89 S.W.3d 204, 210 (Tex.App. – Corpus Christi 2002, no pet.); *see also Smith v. Radam*, *Inc.*, 51 S.W.3d 413, 417 (Tex. App. – Houston [1 Dist.] 2001, no pet.) (a bailment relationship results from a contract under which bailed goods are delivered by the bailor and accepted by the bailee for a specific purpose). An implied bailor-bailee relationship may give rise to an implied bailment contract. *Smith*, 51 S.W.3d at 417. In an implied bailment, it is not necessary that delivery and acceptance be formal. *Russell*, 89 S.W.3d at 211. Knowingly taking property into possession or control may establish an implied bailment. *Id.* The creation of a bailment requires that possession and control over an object pass from the bailor to the bailee. *Allright Auto Parks*, *Inc. v. Moore*, 560 S.W.2d 129, 130 (Tex.Civ.App.– San Antonio 1977, writ ref'd n.r.e.).

Suzlon Wind and Codan argue that there is a fact issue as to whether there was an implied bailment contract with ABR. Suzlon Wind and Shippers entered into an agreement for hot work on the nacelles. Shippers then hired ABR to do the hot work. Suzlon Wind and Codan assert that ABR accepted delivery of the nacelle when it began the hot work on the shipping stands. According to

Suzlon Wind and Codan, there was an "understanding between the parties" that the hot work would be completed and the nacelle would be "returned undamaged and transported to its ultimate inland destination by Fitzley."  (Docket Entry No. 170, at 3).

ABR contends that it did not accept delivery of the nacelle and asserts that Suzlon Wind has admitted that the nacelle was never in ABR's custody or control.  ABR points to Suzlon Wind's statements in previous motions for summary judgment that the nacelle "had passed from ATS into Fitzley's control"[28] and that "the nacelle at issue had been loaded aboard a Fitzley trailer at the time of the fire."[29]  ABR argues that Suzlon Wind has "admitted" that Fitzley had possession, custody, or control of the nacelle, so that ABR could not have accepted delivery.  (Docket Entry No. 180, at 3).

These statements by Suzlon Wind and Codan are not judicial admissions.  A judicial admission is a "formal concession in the pleadings or stipulations by a party or counsel, that is binding on the party making them" and which must have been made "intentionally as a waiver." *Martinez v. Bally's Louisiana*, 244 F.3d 474, 476 (5th Cir. 2001); *see also White v. ARCO/Polymers, Inc.*, 720 F.2d 1391, 1396 (5th Cir. 1983) ("Normally, factual assertions in *pleadings and pretrial orders* are considered to be judicial admissions conclusively binding on the party who made them.") (emphasis added).  Under Federal Rule of Civil Procedure 7(a), a "pleading" is a complaint, answer, reply to counterclaim, answer to cross-claim, third-party complaint, third-party answer, or reply to an answer if ordered by the court. FED.R.CIV.P. 7(a).  The definition of "pleading" under Rule 7(a) does not include "a motion to dismiss or motion for summary judgment." *Zaidi v. Ehrlich*, 732 F.2d

---

[28]  (Docket Entry No. 90, Suzlon Wind's Motion for Summary Judgment against ATS, at 10).

[29]  (Docket Entry No. 102, Suzlon Wind's Motion for Summary Judgment against Fitzley, at 1).

1218, 1219-20 (5th Cir. 1984). The statements made by Suzlon Wind and Codan are not judicial admissions.

This court nonetheless agrees with ABR that a bailment contract cannot be implied on the basis of this record between ABR and Suzlon Wind. ABR had no contact with Suzlon Wind. Glazier testified that Suzlon Wind was unaware of ABR's existence until after the fire. Although a bailment relationship may be established by circumstantial evidence, the evidence must show that the person sought to be charged as a bailee knew he was assuming this relationship and its responsibilities. *Hoye v. Like*, 958 S.W.2d 234, 237 (Tex. App. – Amarillo, 1997, no pet.). There is no evidence in the record that ABR knew that it was assuming the responsibilities of a bailee by performing the hot work. Nor is there evidence that ABR knew that it was taking possession, custody, or control of the nacelle by performing the hot work.

The record shows that ABR was to do the hot work under ATS's instructions. Finnvik of ATS was on site when Pineiro, the ABR welder, arrived. The nacelle had been loaded onto a Fitzley trailer. A Fitzley driver, Fuqua, was waiting to begin transporting the nacelle once the hot work was completed. These facts do not create an implied bailment contract between ABR and Suzlon Wind. *See Hoye*, 958 S.W.2d at 238 (no bailment over cattle was implied when the landowner never had met the cattle caretaker and there was no evidence that actual possession and control of the cattle was transferred to landowner).

ABR's motion for summary judgment on the plaintiffs' breach of contract claim is granted.

### 2.    Breach of Implied Warranty

Suzlon Wind and Codan assert a claim against ABR for breach of an implied warranty to perform the hot work in a good and workmanlike manner. Implied warranties are created by

operation of law. The Texas Supreme Court has recognized an implied warranty in a contract for services when the services relate to the repair or modification of existing tangible goods or property or to the sale of a new home, *see Centex Homes v. Buecher*, 95 S.W.3d 266, 273 (Tex. 2002), or "when public policy mandates." *Rocky Mountain Helicopters*, *Inc. v. Lubbock County Hosp. Dist.*, 987 S.W.2d 50, 52-53 (Tex. 1998). In *Rocky Mountain Helicopters*, the court made it clear that "[p]ublic policy does not justify imposing an implied warranty for service transactions in the absence of a demonstrated, compelling need." *Id.* at 53. There is no compelling need for an implied warranty when other adequate remedies are available. *Id.*; *see also Dennis v. Allison*, 698 S.W.2d 94, 96 (Tex. 1985) ("It is not necessary to impose an implied warranty theory as a matter of public policy because the plaintiff patient has adequate remedies to redress wrongs committed during treatment.").

None of the circumstances recognized by the Texas Supreme Court to support an implied warranty are disclosed in this record. The third amended complaint includes a negligence claim against ABR. Suzlon Wind and Codan have not shown why the negligence claim does not provide an "adequate remed[y] to redress wrongs committed." *See Dennis*, 698 S.W.2d at 96. The record does not demonstrate a compelling need to recognize an implied warranty claim. ABR's motion for summary judgment on the breach of implied warranty claim is granted.

### 3.    Liability Under *Res Ipsa Loquitur*

*Res ipsa loquitur* is a rule of evidence, not a rule of substantive law. *See*, *e.g.*, *Haddock v. Arnspiger*, 793 S.W.2d 948, 950 (Tex. 1990); *Schorlemer v. Reyes*, 974 S.W.2d 141, 146 (Tex.App.– San Antonio 1998, writ denied). *Res ipsa* allows a plaintiff to show that the circumstances under which an accident or injury occurred provide sufficient evidence of the defendant's negligence to

support such a finding.  Two elements must be present before *res ipsa* applies: the character of the accident must be such that it would not ordinarily occur in the absence of negligence; and the instrumentality causing the injury must have been under the defendant's management and control. *Haddock*, 793 S.W.2d at 950.

Suzlon Wind and Codan argue that *res ipsa* applies because "the nacelle would not have caught fire" without "ABR's oxyacetylene torch." (Docket Entry No. 170, at 7).  ABR contends that *res ipsa* is inappropriate because there is direct evidence that negligence caused the fire.  Indeed, ABR alleges that Suzlon Wind's negligent failure to communicate and implement "the insulation removal instruction and the hot work ban" caused the fire.  (Docket Entry No. 160, at 12).  Suzlon Wind and Codan allege that the defendants' failure to meet applicable hot work standards and failure to take numerous fire-prevention procedures caused the nacelle fire.

Texas courts have found that *res ipsa loquitur* is not appropriate when direct evidence points to negligence as the cause of an incident.  *See Rebel Drilling Co.*, *L.P. v. Nabors Drilling USA*, *Inc.*, 2004 WL 2058260, at *13 (Tex.App.– Houston [14 Dist.] 2004, no pet.) (*res ipsa* was not appropriate because plaintiff "consistently claimed that specific acts of negligence on [defendant's] part caused the blowout"); *Trans Am. Holding*, *Inc. v. Market-Antiques and Home Furnishings*, *Inc.*, 39 S.W.3d 640, 649 (Tex.App.-Houston [1st Dist.] 2000, pet. denied) (*res ipsa* was not appropriate because the plaintiff's experts testified that specific conduct by the defendant's employees caused the fire); *Farr v. Wright*, 833 S.W.2d 597, 600-01 (Tex.App.– Corpus Christi 1992, writ denied) (determining that *res ipsa*, "which concerns cases involving only weak circumstantial evidence," was inapplicable when both circumstantial and direct evidence pointed to a specific act of negligence).  In this case, both sides allege and provide direct and circumstantial summary

judgment evidence of allegedly negligent acts and omissions that caused the fire.  The evidence of negligence precludes the application of *res ipsa*.  ABR's motion for summary judgment on the plaintiffs' *res ipsa* theory is granted.

## IV.    ABR's Motions to Compel

ABR moved to compel documents relating to the November 11, 2005 Minnesota nacelle fire, (Docket Entry No. 159), and to compel the deposition of Andy Cukurs, (Docket Entry No. 187). The parties' arguments are examined below.

### A.    The Motion to Compel Documents

ABR moved to compel Suzlon Wind to produce documents relevant to the November 11, 2005 Minnesota nacelle fire, including a report prepared by Glazier for Suzlon Wind's board of directors.  Suzlon Wind asserts that Glazier's report is privileged because it is an attorney-client communication written and sent to facilitate the rendition of legal advice.  ABR asserts that the Glazier report is not privileged because it is "nothing more than a compilation of facts" or an "accident report."  ABR also moved to compel reopening Glazier's deposition to question him about this report.  Suzlon Wind has submitted the documents that are the subject of the motion and an amended privilege log for this court's *in camera* review.

 In civil cases in which state law supplies the rule of decision, privilege is determined in accordance with that state's law. *See* FED R. EVID. 501.  The parties agree that Texas law governs the attorney-client privilege claim.

To be protected by the attorney-client privilege, a communication must be confidential, between qualified persons, and for the purpose of facilitating the rendition of professional legal services.  *See* TEX.R. EVID. 503(b).  Qualified persons include the attorney, the client, and their

representatives.  *Id.*  "A communication is 'confidential' if not intended to be disclosed to third persons other than those to whom disclosure is made in furtherance of the rendition of professional legal services to the client or those reasonably necessary for the transmission of the communication." TEX.R. EVID. 503(a)(5).  There is no presumption under Texas law that documents are privileged; the party asserting privilege must demonstrate its application.  *In re E.I. DuPont de Nemours & Co.*, 136 S.W.3d 218, 225 n. 3 (Tex. 2004); *see also In re Monsanto Co.*, 998 S.W.2d 917, 925 (Tex. App-Waco 1999, orig. proceeding).  "The documents themselves may constitute sufficient evidence to make a prima facie showing of attorney-client or work product privilege."  *In re E.I. DuPont de Nemours & Co.*, 136 S.W.3d at 223.

Suzlon Wind asserts that the "chronology" ABR seeks to compel is Document #11 in its privilege log.  (Docket Entry No. 172, at 2).  Document #11 is not a report prepared by Glazier, but an e-mail from John Hewitt to a number of individuals, including Glazier, sent on November 11, 2005.  In the e-mail, Hewitt gives a factual summary of what happened in the Minnesota fire and informs the recipients that a conference call is scheduled later that day to "ensure that all relevant parties are informed – determine facts; [a]gree point contact persons for any ensuing activities; [and] [a]gree lines of communication."  Hewitt asked the recipients to "please be patient" and not comment to the press at that time.  This document does not appear to be the report ABR seeks.

This court's *in camera* review shows that Document #25 more closely matches the description of the document ABR wants to obtain.  Document #25 from the privilege log is a memorandum from Glazier to Per Hornung Pedersen, Andris E. Cukurs, and Thomas Kjaer Andersen dated November 21, 2005.  Pedersen was Chief Executive Officer of Suzlon Energy A/S Denmark, a subsidiary of Suzlon Energy.  Cukurs is the Chief Executive Officer of Suzlon Wind.

47

Andersen is the in-house counsel for Suzlon Energy A/S Denmark. "Pursuant to [their] instructions," Glazier recounts in the memorandum the events relating to the Minnesota fire, both before and after November 11, 2005.

ABR argues that the attorney-client privilege does not apply to this memorandum because Glazier was acting as an investigator, not as an attorney. Suzlon Wind responds that the memorandum is privileged because it "does not constitute the underlying facts, but is an attorney-client communication that contains a recitation of those underlying facts." (Docket Entry No. 172, at 2). Suzlon Wind asserts that because the underlying facts have already been disclosed in discovery, the assertion of privilege is not being used to conceal facts. (*Id.*).

The facts of *In re Texas Farmers Ins. Exchange*, 990 S.W.2d 337 (Tex. App. – Texarkana 1999, pet. denied) and *Harlandale Independent School Dist. v. Cornyn*, 25 S.W.3d 328 (Tex. App. – Austin 2000, pet. denied) are instructive. In *Texas Farmers*, a property insurer hired a lawyer to interview the insureds under oath after a suspicious fire. 990 S.W.2d at 339. The insurer asked the lawyer to provide a summary of what happened and a recommendation for going forward. *Id.* The court held that the attorney-client privilege did not apply to the factual summary prepared by the lawyer after these interviews because the lawyer was acting as an investigator, not a lawyer. *Id.* at 341. By contrast, in *Harlandale*, a school district retained an attorney to conduct an investigation of the district's potential liability in connection with a campus officer's grievance. 25 S.W.3d at 330. The trial court held that the attorney's report was not privileged because it was prepared in her dual roles as attorney and investigator. *Id.* at 331. The appellate court reversed, concluding that the attorney's investigation was a legal service because she was not only collecting facts but was retained to offer legal advice about those facts. *Id.* at 333-34.

This court's *in camera* review does not show that the communication in Document #11 of the privilege log was intended to facilitate obtaining legal advice. Rather, the purpose of Document #11 was simply to notify Suzlon Wind representatives about the Minnesota fire. On the other hand, the evidence shows that Document #25 facilitated obtaining legal advice. Glazier, Suzlon Wind's in-house counsel, prepared the report at the request of Suzlon Wind's and Suzlon Energy's highest officers and in-house counsel after the Minnesota fire and the death of an EMS worker. The memorandum indicates that Glazier prepared the report in his capacity as a lawyer, not merely as an investigator. The memorandum itself, and the circumstances under which Glazier prepared it, show a desire for confidentiality. There is no evidence that Document #25 has been disclosed to others. This document is protected by the attorney-client privilege.[30]  *See In re JDN Real Estate-McKinney L.P.*, 211 S.W.3d 907, 927 (Tex. App. – Dallas 2006, orig. proceeding) (e-mail from city attorney to CEO and president of city's economic development corporation, which contained confidential information, was protected by attorney-client privilege in city's condemnation action); *Wiley v. Williams*, 769 S.W.2d 715, 717 (Tex. App. – Austin, 1989, orig. proceeding) (correspondence between attorney and liability insurer conveying information about progress and handling of personal injury claims was protected by attorney-client privilege).

The motion to compel is granted as to Document #11 and denied as to Document #25.

---

[30]  Suzlon Wind also asserts that Document #25 is protected attorney work product. If a document is protected by attorney-client privilege, the work-product doctrine does not apply. *See, e.g.*, *Upjohn Co. v. United States*, 449 U.S. 383, 397, 101 S.Ct. 677, 66 L.Ed.2d 584 (1981) ("To the extent that the material subject to the summons is not protected by the attorney-client privilege as disclosing communications between an employee and counsel, we must reach the ruling by the Court of Appeals that the work-product doctrine does not apply . . . ."); *Swidler & Berlin v. United States*, 524 U.S. 399, 403 n. 1, 118 S.Ct. 2081, 141 L.Ed.2d 379 (1998) ("Because we sustain the claim of attorney-client privilege, we do not reach the claim of work product privilege."). Because Document #25 is protected by attorney-client privilege, this court need not apply the work-product doctrine.

ABR's motion to compel the reopened deposition of Glazier is denied.[31]

ABR also moved to compel all communications between Suzlon Wind and Energy Maintenance Service ("EMS"), Suzlon Wind's contractor for the Minnesota project, about hot-work instructions or warnings.   Suzlon Wind asserts that it has produced all relevant nonprivileged information about the Minnesota fire.  Suzlon Wind asserts that it has no documents reflecting communications with EMS concerning hot-work instructions or warnings.  Suzlon Wind asserts that, other than the contract with EMS, there are no documents responsive to ABR's request.  Suzlon Wind has withheld production of its contract with EMS on the ground that it is confidential, proprietary information.  ABR contends that Suzlon Wind "cannot continue to claim" that warnings about the fire hazards of nacelles were given to EMS "[u]nless Suzlon can point to some admissible evidence supporting these assertions."  (Docket Entry No. 179, at 6).

ABR may argue at trial that the absence of any documents about warnings from Suzlon Wind to EMS about hot work near the nacelles creates an inference that no warnings were given.  That does not provide a basis for an order compelling Suzlon Wind to produce documents that do not exist.  With respect to Suzlon Wind's contract with EMS, however, as ABR points out, the parties have entered into a confidentiality agreement.  (Docket Entry No. 29).  Suzlon Wind cannot withhold production of its contract with EMS, Document #1, or its contract with the Minnesota

---

[31]   ABR contends that Suzlon Wind's failure to produce a nine-page document titled "Code of Safe Practices" that was produced in another case  in this district involving Suzlon Wind, "has hindered ABR's ability to defend this matter" and "further calls into question Suzlon's entire document production." (Docket Entry No. 179, at 8).  As Suzlon Wind points out, this document was not responsive to any request for production in this case.  ABR requested production of "any and all documents concerning welding operations in and around nacelles at any time."  In response, among other things, Suzlon Wind produced a draft safety manual that Glazier testified at his deposition was being treated as the official safety manual in January 2006, when the nacelle fire at issue in this case occurred.  The Code of Safe Practices was produced in the other case in response to a request to produce safety policies in effect on February 23, 2007.

company Bendwind, LLC, Document #288, on the basis that they are confidential.  The motion to

compel is granted as to these documents.

The other documents in Suzlon Wind's privilege log are confidential communications either

to or from Suzlon Wind's in-house and outside legal counsel.  The evidence shows that these

documents were communications made to "facilitate the rendition of legal advice to the client."  *See*

*Seibu Corp. v. KPMG LLP*, No. 3-00-CV-1639-X, 2002 WL 87461, at *3 (N.D.Tex. Jan.18, 2002).

These documents are protected by attorney-client privilege.  The motion to compel their production

is denied.[32]

### B.    The Motion to Compel Deposition

ABR moved to compel the deposition of Andy Cukurs, Chief Executive Officer of Suzlon

Wind.  ABR asserts that it first learned that Cukurs might have relevant knowledge on October 17,

2008, when Suzlon produced a set of e-mails involving Cukurs.  On November 17, 2008, ABR asked

that Suzlon make Cukurs available for deposition.  (Docket Entry No. 187, Ex. C).  Suzlon did not

respond.  On December 11, 2008, ABR followed up on its request, stating that "[i]f we do not

receive a response by December 15, 2008, we will file the appropriate motion."  (*Id.*, Ex. D).  The

motion was filed on December 29, 2008.

In determining whether a motion to compel has been timely filed, most courts look to the

discovery deadline and not the motion-filing deadline.  *See Days Inn Worldwide*, *Inc. v. Sonia*

*Investments*, 237 F.R.D. 395, 397-98 (N.D. Tex. 2006) (citing cases).  The extended deadline for

---

[32] Suzlon Wind produced Documents #31, #32, #34, and #40 to ABR on October 17, 2008.  ABR
asserts that these documents do not meet the description on the privilege log.  The documents on the privilege
log were created in 2005, and ABR asserts that the documents produced by Suzlon Wind were created in 2006
or 2008.  As ABR concedes, this is "likely an innocent oversight," because this court's *in camera* review of
the documents submitted by Suzlon Wind reveals that #31, #32, #34, and #40 were all created in 2005.

completing discovery in this case was December 15, 2008.  (Docket Entry No. 165).  ABR learned

about Cukurs in discovery produced two months before the December 15 deadline.  ABR did not

ask for the court's assistance in obtaining Cukurs's deposition until two weeks after the discovery

deadline had expired.  The motion to compel is untimely.  *See Days Inn*,  237 F.R.D. at 398-99

(finding defendant's motion to compel untimely where filed two weeks after discovery deadline,

even though it was filed on day of scheduling order deadline for all motions); *Ginett v. Federal

Express*, 166 F.3d 1213, 1998 WL 777998, at *5 (6th Cir. 1998) (unpublished table decision)

(finding no abuse of discretion when the trial court denied a motion to compel filed two months after

discovery deadline, because the plaintiff knew of the document at issue long before the deadline);

*Ayala-Gerena v. Bristol Myers-Squibb Co.*, 95 F.3d 86, 94 (1st Cir. 1996) (finding no abuse of

discretion by the district court in denying "what was clearly Appellants' untimely motion to compel

document production" when the "Appellants waited more than one month after the second extended

discovery deadline had elapsed to properly request an order from the district court"); *Suntrust Bank

v. Blue Water Fiber, L.P.*, 210 F.R.D. 196, 200-01 (E.D. Mich. 2002) (finding that a district court

may deny a motion to compel discovery filed after the close of discovery and noting that numerous

courts have denied discovery motions as untimely because the moving party had all the information

it needed to file the discovery motion earlier).  ABR's motion to compel the deposition of Andy

Cukurs is denied**.**

## V.      The Motions to Exclude Witness Testimony

Suzlon Wind and Codan moved to exclude the testimony of Ruben Arredondo, a Port of

Houston employee responsible for administering hot-work permits.  ABR designated Arredondo as

a witness.  ABR has moved to exclude the testimony of Dr. Lawrence M. Matta and Haskell

Simpkins, the plaintiffs' designated expert witnesses.

### A.    Ruben Arredondo

In July 2008, Suzlon Wind and Codan obtained a business records affidavit from Arredondo, designated as the custodian for records for a blank form welding and hot-work permit issued by the Port of Houston Authority. (Docket Entry No. 168, Ex. A).  On September 19, 2008, ABR identified Arredondo and/or a Port of Houston Authority representative as potential witnesses in a Rule 26(e)(1) supplemental disclosure.  ABR stated that Arredondo or a Port of Houston Authority representative "will testify about rules, regulations, and/or practices at the Port of Houston pertaining to hot work."  (Docket Entry No. 157, Ex. 1).  ABR informed Suzlon Wind and Codan that the Port of Houston Authority preferred that "any trial testimony be obtained via deposition." (Docket Entry No. 168, Ex. B).

Suzlon Wind and Codan argue that Arredondo should not be permitted to testify because when ABR designated him as a witness, September 19, 2008 was the discovery deadline.  Suzlon Wind and Codan contend that ABR's "stale designation" was an attempt to reopen discovery by "forcing a deposition preliminary to trial testimony."   On October 1, 2008, however, this court extended the discovery deadline to December 15, 2008.  The extension mooted the objection that ABR did not timely designate Arredondo as a witness.        Suzlon Wind and Codan also assert that Arredondo should be excluded as a witness because his testimony will "necessarily include opinion testimony in the form of expert testimony."  Suzlon Wind and Codan argue that the only reasons for ABR to call Arredondo as a witness are because: (1) it "expect[s] him to testify that the rules and regulations of the Port of Houston Authority do not apply" to this case; or (2) to testify that the Port "does not enforce its own rules and regulations."  (Docket Entry No. 176, at 3).  Suzlon Wind and

53

Codan argue that testimony that the rules and regulations do not apply would be inadmissible as a conclusion of law.  Suzlon Wind and Codan argue that any testimony that the Port Authority does not enforce its own rules and regulations is irrelevant.

ABR responds that Arredondo will not offer expert testimony but lay opinion testimony under Rule 701 of the Federal Rules of Evidence.  Rule 701 states:

> If the witness is not testifying as an expert, the witness' testimony in the form of opinions or inferences is limited to those opinions or inferences which are (a) rationally based on the perception of the witness, (b) helpful to a clear understanding of the witness' testimony or the determination of a fact in issue, and (c) not based on scientific, technical, or other specialized knowledge within the scope of Rule 702.

FED. R. EVID. 701.  ABR anticipates that Arredondo will testify "regarding his daily duties of administering the hot work permitting program at the Port and the Port's policies pertaining to hot work permitting."  (Docket Entry No. 168, at 5).  ABR asserts that this testimony will not be based on "scientific, technical, or other specialized knowledge," but on Arredondo's own perceptions from working at the Port of Houston.  ABR contends that Arredondo can offer testimony about "the Port's requirements for hot work permits and their relation to the facts at issue in this case" as a lay opinion because it will be "extremely helpful to determine the legitimacy of Plaintiffs' claims."  (Docket Entry No. 168, at 5-6).

Testimony by Arredondo about the Port of Houston Authority's policies with respect to welding and hot-work permits in general and Arredondo's day-to-day experience in administering permits is relevant and admissible under Rule 701.  But Arredondo cannot testify under Rule 701 about how those policies or experience might apply to the facts of this case.  The record does not suggest that Arredondo has any firsthand knowledge of the underlying facts.  Neither Shippers nor

ABR applied to the Port of Houston Authority for a welding and hot-work permit.  Any testimony

by Arredondo applying the rules and regulations on hot-work permits to the facts at issue would be

impermissible.  Nor can Arredondo testify about whether Tariff No. 8 applies to this case; that is a

conclusion of law.  *See  United States v. $9,041,598.68*, 163 F.3d 238, 255 (5th Cir. 1998) (noting

that the Fifth Circuit has repeatedly held that the Federal Rules of Evidence do not allow an expert

to render conclusions of law) (citing *Snap-Drape*, *Inc. v. Comm'r of Internal Revenue*, 98 F.3d 194

(5th Cir. 1996)).

The plaintiffs' motion to exclude Arredondo's testimony is granted in part and denied in part.

**B.      The Plaintiffs' Expert Witnesses**

Suzlon Wind and Codan designated Matta as "an engineer and certified fire and explosion

investigator" and designated Simpkins as "an engineer and welding expert." (Docket Entry No. 173,

Ex. 1).  Both witnesses are "expected to testify regarding liability issues in this case."  (*Id.*).  ABR

moved to exclude Matta's testimony on the grounds that he is not qualified to testify as an expert

witness and that his testimony is unreliable because it is not based on sufficient facts and data.  ABR

moved to exclude Simpkins's testimony on the grounds that it is not the product of reliable

methodology and is not based on sufficient facts or data.

**1.      The Legal Standard for Admitting Expert Testimony**

Rule 702 states that "[i]f scientific, technical, or other specialized knowledge will assist the

trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an

expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an

opinion or otherwise, if (1) the testimony is based upon sufficient facts or data, (2) the testimony is

the product of reliable principles and methods, and (3) the witness has applied the principles and

methods reliably to the facts of the case." As a threshold matter, the trial judge must determine whether the proffered witness is qualified to give the expert opinion he seeks to express. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 156, 119 S.Ct. 1167, 143 L.Ed.2d 238 (1999); *Daubert v. Merrell Dow Pharms., Inc.*, 509 U.S. 579, 588, 113 S.Ct. 2786, 125 L.Ed.2d 469 (1993). Witnesses may be qualified as experts if they possess specialized knowledge, skill, experience, training, or education. FED. R. EVID. 702. The court must determine whether the proposed expert's training or experience is sufficiently related to the issues and evidence before the court that the testimony will assist the trier of fact. *Primrose Operating Co. v. Nat'l Am. Ins.*, 382 F.3d 546, 562-63 (5th Cir. 2004).

The burden is on the party offering the expert testimony to establish by a preponderance of the evidence that it is admissible. *Moore v. Ashland Chem., Inc.*, 151 F.3d 269, 276 (5th Cir.1998) (en banc). The district court must make a "preliminary assessment of whether the reasoning or methodology underlying the testimony is scientifically valid [the reliability criterion] and of whether the reasoning or methodology can be applied to the facts at issue [the relevance analysis]." *Skidmore v. Precision Printing & Packaging, Inc.*, 188 F.3d 606, 617 (5th Cir. 1999) (quoting *Daubert*, 509 U.S. at 592-93, 113 S.Ct. 2786). The district court's responsibility is "to make certain that an expert, whether basing testimony upon professional studies or personal experience, employs in the courtroom the same level of intellectual rigor that characterizes the practice of an expert in the relevant field." *Kumho Tire*, 526 U.S. at 152, 119 S.Ct. 1167. The court "must ensure the expert uses reliable methods to reach his opinions; and those opinions must be relevant to the facts of the case." *Guy v. Crown Equip. Corp.*, 394 F.3d 320, 325 (5th Cir. 2004). In making its reliability determination, the court should not decide the validity of the expert's conclusions, but instead

56

consider the soundness of the general principles or reasoning on which the expert relies and the propriety of the methodology that applies those principles to the facts of the case. *Daubert*, 509 U.S. at 594-95, 113 S.Ct. 2786; *Watkins v. Telsmith*, *Inc.*, 121 F.3d 984, 989 (5th Cir. 1997); *Brumley v. Pfizer*, *Inc.*, 200 F.R.D. 596, 600 (S.D. Tex. 2001).

### 2.     Dr. Lawrence M. Matta

ABR argues that Matta is not qualified to testify as an expert witness about welding or hot work conducted on a wind turbine generator because he has never testified in court or been qualified as an expert witness in a trial; does not hold any welding licenses; has not worked as a welder; has no experience with wind turbine generators; and has no publications concerning welding or wind turbine generators.  ABR points to Matta's deposition testimony that he is a "cause and origin expert"retained to investigate and determine the cause of the fire in this case.

ABR's argument that Matta is not qualified to testify about welding or welding safety procedures is unpersuasive.  "Prior qualification as an expert witness, specialized degrees, licenses or publications in their field, while all commendable, are not required to be possessed by every witness acting as an expert."  *Plywood Property Assoc. v. Nat'l Flood Ins. Program*, 928 F.Supp. 500, 508 (D.N.J. 1996).  Expert status may be based on "knowledge, skill, *experience*, training, or education."  FED. R. EVID. 702 (emphasis added).  The Committee Note to the 2000 Amendments of Rule 702 explains that "[n]othing in this amendment is intended to suggest that experience alone . . . may not provide a sufficient foundation for expert testimony."  FED. R. EVID. 702 Committee Note (2000 Amendments).

Matta is certified as a fire and explosion investigator by the National Association of Fire Investigators, which uses NFPA standards to conduct investigations.  Matta is a member of the

NFPA.  (Docket Entry No. 173, Ex. 2, Matta Deposition at 85:3-7).  He has experience with NFPA standards, including 51B, and has conducted several fire investigations that involved welding or hot work as the cause or origin.  (*Id.*, Ex. 2, Matta Deposition at 85:8-12).  Matta is qualified under Rule 702 to testify about the cause and origin of the nacelle fire as well as welding and fire-prevention procedures.  The extent of Matta's specific training and knowledge about welding standards and procedures goes to the weight of his testimony, not its admissibility.  *See Williams v. Warren*, 253 F.3d 700, 2001 WL 498501, at *2 (5th Cir. 2001) (unpublished table decision) (holding that a doctor was qualified to discuss broken bones even though he was not an orthopedic surgeon and that his "credentials go to the weight, not the admissibility" of his testimony).

ABR's contention that Matta is not qualified to testify about welding and fire prevention procedures in this case because he lacks experience with wind turbine generators is also unavailing. Courts allow experts to testify to matters within their general expertise even when they lack qualifications as to specific matters within that field if their general expertise allows them to give relevant and reliable opinions.  *See In re Methyl Tertiary Butyl Ether ("MTBE") Products*, No. 1:00-1898, 2008 WL 1971538, at *6 (S.D.N.Y. May 7, 2008) (rejecting argument that expert who was qualified in ethanol production, specifications, and distribution could not give testimony about the growth of ethanol production to meet demand requirements because he was not specifically trained in economics); *Santoro v. Donnelly*, 340 F.Supp.2d 464, 473 (S.D.N.Y. 2004) ("The question is not whether the engineer is an expert on the exact issues presented in the case, but rather, whether his general engineering experience qualifies him to testify in an area in which he does not have extensive expertise.").  Matta is qualified as a fire and explosion investigator and has experience

investigating fires caused by welding or hot work.  His experience and expertise qualifies him to testify about fire prevention procedures for hot work on different objects or structures.

ABR contends that Matta's testimony should be excluded because his "cause and origin" testimony is cumulative of another Suzlon Wind expert, Gary Farge.  Matta opined that the nacelle fire in this case ignited when sparks from Pineiro's torch contacted the foam insulation inside the nacelle.  ABR asserts that "this conclusion as to the cause and origin of the fire is the same conclusion reached by Gary Farge." (Docket Entry No. 163, at 4).  Testimony otherwise admissible under Rule 702 should be excluded under Rule 403 if the testimony is cumulative or needlessly time-consuming.  FED. R. EVID. 403(b).  Matta's report is part of the record before this court; Farge's report is not.  Without more information on the substance of Farge's report, however, this court cannot conclude that Matta's report is cumulative merely because it reaches the same overall conclusion as Farge.

ABR also argues that Matta's testimony should be excluded because he relied on insufficient facts and data in preparing his report.  Matta issued a report dated January 8, 2008 and a supplement to that report dated January 21, 2008.  To complete his report, Matta inspected the fire-damaged nacelle and analyzed a sample of the foam insulation using Fourier Transform Infrared Spectroscopy.  He also reviewed, among other things, the depositions of Fuqua and Pineiro, many documents produced in discovery, and standards promulgated by the NFPA and the American Welding Society ("AWS").  Matta acknowledged that "discovery is ongoing in this matter" and stated that "[s]hould additional information become available, we reserve the right to modify or supplement these opinions as appropriate."  (Docket Entry No. 176, Ex. 1).  ABR argues that Matta's report lacks proper foundation because it does not take into account information or

documents about the October and November 2005 fires involving Suzlon Wind nacelles; Suzlon Wind's no-hot-work instruction; Suzlon Wind's foam-removal procedure; or the testimony in the depositions taken since January 2008.

Matta's testimony is admissible under Rule 702(1).  Suzlon Wind and Codan have designated Matta to testify about what physically ignited the fire on January 18, 2006.  Matta personally inspected the nacelle at issue and conducted testing on the foam insulation.  He reviewed the deposition testimony of the two individuals who were present when the fire began.  Matta reviewed a number of the documents produced in discovery in this case.  Matta's report shows that his opinion is based on sufficient facts and data to be admissible.  *Cf. Florida Power and Light Co. v. Qualified Contractors*, No. 04-80505-Civ., 2005 WL 5955702, at *3 (S.D. Fla. Dec. 6, 2005) (concluding that "an expert opinion that it is not based upon any independent investigation or testing and merely relies upon a limited review of deposition testimony and contracts" is not "based upon sufficient facts or data"); *Storage Technology Corp. v. Cisco Systems, Inc.*, No. Civ. 00-2253, 2003 WL 22231544, at *9 (D. Minn. Sep. 25, 2003) (concluding that proffered expert witness lacked sufficient factual foundation for opinion regarding hardware design where witness had never physically inspected the hardware nor spoken with anyone who had inspected it).

Moreover, according to Suzlon Wind and Codan "Matta has reviewed a number of documents" since issuing his report, including some of the documents cited by ABR in its motion to exclude.  Suzlon Wind and Codan assert that Matta has not changed his opinion and did not need to issue a supplemental report based on his review of these materials.  Suzlon Wind's duty to disclose information concerning previous fires, the no-hot-work instruction, and the foam-removal procedure is a question of law.  Matta need not address these issues to provide an opinion as to what

ignited the nacelle fire.

ABR's motion to exclude Dr. Matta's testimony is denied.

### 3.    Haskell Simpkins

Simpkins issued a report on July 22, 2008 in which he opined that Shippers and ABR did not

follow "careful fire precautions" and "customary good practices and fire prevention procedures"

because they did not meet the standards promulgated by the NFPA and the AWS.  Simpkins also

opined that Pineiro failed to use an oxyacetylene torch tip of the right size or at the proper psi level.

Pineiro testified in his deposition that he used 80 psi on a #2 cutting tip to cut holes in the metal

shipping stands, which were a 3/4" metal plate.  Simpkins stated that to minimize the amount of

"dross" (expelled molten and oxidized metal) Pineiro should have used a #1 tip at no greater than

30-35 psi.  Simpkins concluded that had Pineiro done so, the amount of dross would have been

reduced by as much as 33%.  At his deposition, Simpkins was asked how he arrived at that figure.

He testified that "[i]t was a volumetric calculation on the material removed using the two cutting

heads and the assumed kerfs."  (Docket Entry No. 189, Ex. 2, Simpkins Deposition at 188:25-189:2)

ABR moved to exclude Simpkins's testimony, arguing that it is not based on sufficient facts

and data.  (Docket Entry No. 186, at 5).  Simpkins reviewed, among other things, photographs of

the nacelle; numerous documents produced in discovery; the report of ABR's expert witness Joseph

Winer; the report of Shippers's expert witness John G. Atherton; transcripts of the depositions of

Pineiro, Templet, Finnvik, Fuqua, Winer, Atherton, and Matta; and the welding and hot work

standards issued by the NFPA and AWS.  (Docket Entry No. 186, Ex. 1, Simpkins Report).  ABR

argues that the materials Simpkins reviewed are incomplete because he did not consider the

depositions of any Suzlon Wind employees or documents "which are harmful to and inconsistent

with the positions taken by Suzlon." (Docket Entry No. 186, at 3). Specifically, ABR faults Simpkins's report for failing to consider information or documents concerning the October and November 2005 fires involving Suzlon nacelles, Suzlon Wind's no-hot-work instruction, Suzlon Wind's foam-removal procedure, and the deposition testimony of Glazier, Hewitt, and Christensen.

Simpkins's opinions are based on sufficient facts and data to be admissible under Rule 702. Simpkins opines that the defendants did not follow the appropriate standards for the hot work. This conclusion was based on his review of NFPA and AWS standards for hot work and fire prevention and all the actions taken by Shippers, ABR, and Pineiro. Simpkins was presented as an expert to testify about whether Shippers and ABR followed the proper hot work and fire-prevention procedures given the information they possessed. They did not possess information about the prior fires, the no-hot-work instruction, or the foam-removal procedure.

ABR's argument that Simpkins did not review sufficient facts and data goes to the weight of his opinion, to be brought out in cross-examination and resolved by the jury, not to admissibility. *See Hartley v. Dillard's, Inc.*, 310 F.3d 1054, 1061 (8th Cir. 2002) ("As a general rule, the factual basis of an expert opinion goes to the credibility of the testimony, not the admissibility, and it is up to the opposing party to examine the factual basis for the opinion in cross-examination."); *Stecyk v. Bell Helicopter Textron, Inc.*, 295 F.3d 408, 414 (3d Cir. 2002) ("A party confronted with an adverse expert witness who has sufficient, though perhaps not overwhelming, facts and assumptions as the basis for his opinion can highlight those weaknesses through effective cross-examination."); *NutraSweet Co. v. X-L Engineering Co.*, 227 F.3d 776, 790 (7th Cir. 2000) (fact that an expert for the plaintiff landowner in a CERCLA cost-recovery action relied on data obtained by hydrologists hired by the plaintiff, and that expert visited site only once, went only to the weight and not the

admissibility of expert's testimony); *North v. Ford Motor Co.*, 505 F.Supp.2d 1113, 1119 (D. Utah 2007) (fact that expert was not provided with "all of the professional information that she said would be needed" was a matter of the weight, not admissibility, of her testimony).

ABR also argues that Simpkins's opinion is not the product of reliable principles and methods. ABR asserts that Simpkins's calculations on the amount of dross produced by Pineiro's torch are unreliable because they were performed "in his head and on a calculator with no writing memorializing the calculation." (Docket Entry No. 186, at 7). ABR also argues that Simpkins's methodology is unreliable because "he did not perform any testing in connection with the preparation of his report." (*Id.*).

At his deposition, Simpkins testified as follows:

> Q:    Did you do that in writing, or did you do that in your head?
>
> A:    Actually I did it on a calculator, and that's the answer that I calculated.
>
> Q:    So there's no writing memorializing your calculation?
>
> A:    No. It's just a calculation. As I did with you verbally, it becomes 2 pi r times the diameter times the kerf times the thickness of the volume and you take the ratio of those two volumes and you get the 33 percent.
>
> Q:    And did you perform any testing in connection with your report?
>
> A:    No.
>
> Q:    And where did you get the formula that you used to come up with the 33 percent?
>
> A:    That's basic geometry from high school. It is a volumetric calculation of the material that would have to be removed using the cutting torch. You could fine tune that by probably plus or minus 2 or 3 percent by conducting cutting tests in a

63

three-quarter-inch plate to verify the kerf width.

But the kerf width that's published for cutting tips is a reasonable assumption used by people like myself to assume both costs – operation costs and material removal if you're stacking up multiple cuts in a sheet and you need to know how much kerf is there.   It's reasonable to make those assumptions using the manufacturer's stated kerf, but there is some variation of that.   And I would give you plus or minus a couple of percent.

(Docket Entry No. 189, Ex. 2, Simpkins Deposition at 189:3-190:8).

ABR does not challenge the method of Simpkins's calculation but asserts that his testimony is unreliable because he did not "show his work" in his report.   Simpkins testified that he used a calculator to arrive at the 33% dross-reduction figure and explained the calculation method.   ABR does not point to anything inherently unreliable about Simpkins's calculations.   Moreover, Simpkins need not have performed tests using an oxyacetylene torch on the shipping stands with a #1 torch tip at 30-35 psi to determine the reduction in dross that would have resulted had Pineiro used a #1 torch tip at 30-35 psi.   As long as Simpkins's methodology in calculating the dross reduction is "of the type reasonably relied upon by experts in the field," which ABR does not contest, Simpkins's assumptions do not make his calculation inadmissible.   Simpkins testified that individuals in his field routinely make such assumptions about the kerf width when making similar calculations.

ABR's motion to exclude Simpkins's testimony because it is not the product of reliable principles and methods is denied.

Lastly, ABR contends that Simpkins's opinion on the January 17, 2006 letter from Glazier to Templet will not assist the jury because the letter is "written in plain English" and is not the type of document requiring an expert opinion.   In his report, Simpkins explained that the statement in the letter from Glazier to Templet about "the preferred customary good practices and procedures for

64

welding and cutting" meant those "contained in ANSI Z49.1:2005," which is promulgated by the AWS, and in "NFPA 51B." (Docket Entry No. 186, Ex. 1, Simpkins Report). Simpkins concluded that "[w]hile additional industry specific standards and practices exist, these two documents together constitute a formidable defense against general loss and injury due to welding and cutting related hot work." (*Id.*). Experts have been permitted to testify about the proper interpretation of contract terms, an issue of law, when the meaning depends on trade practice. *See*, *e.g.*, *Kona Tech. Corp. v. S. Pac. Transp. Co.*, 225 F.3d 595, 611 (5th Cir.2000) (expert testimony properly admitted to interpret contract provisions having a specialized meaning in the railroad industry). But such expert testimony is admissible only if the contract language is ambiguous or involves a specialized term of art, science or trade. *See Sheet Metal Workers*, *Int'l Assn*, *Local Union No. 24 v. Architectural Metal Works*, *Inc.*, 259 F.3d 418, 424 n. 4 (6th Cir. 2001) ("[T]he construction of unambiguous contract terms is strictly a judicial function; the opinions of percipient or expert witnesses regarding the meaning(s) of contractual provisions are irrelevant and hence inadmissible."); *Coregis Insurance Co. v. Bell*, 1999 WL 244097 (E.D. La. April 21, 1999) *aff'd* 203 F.3d 828 (5th Cir. 1999) (trial court rejected use of English language expert to interpret contract provisions, but indicated that the result might be different if the language at issue was a term of art, science or trade); *North Am. Specialty Ins. Co. v. Myers*, 111 F.3d 1273, 1281 (6th Cir. 1997) (quoting *TCP Indus.*, *Inc. v. Uniroyal*, *Inc.*, 661 F.2d 542, 549 (6th Cir. 1981)) ("Absent any need to clarify or define terms of art, science, or trade, expert opinion testimony to interpret contract language is inadmissible."); *Phillips Oil Co. v. OKC Corporation*, 812 F.2d 265, 279-80 (5th Cir.) *cert. denied*, 484 U.S. 851, 108 S.Ct. 152 (1987) (affirming trial court's admission of expert testimony to explain accounting provisions of unambiguous farmout agreement, because those provisions had a specialized usage and meaning

within the oil and gas industry); *Heritage Res.*, *Inc. v. NationsBank*, 939 S.W.2d 118, 121 (Tex. 1996) (interpretation of unambiguous contract is a question of law for the court).

This court has concluded that the January 17, 2006 agreement is unambiguous.  The parties do not contend that "customary good practices and fire prevention procedures" is a specialized term of trade.  Simpkins's testimony about the meaning of the terms in that agreement is inadmissible.

ABR's motion to exclude Simpkins is granted in part and denied in part.

## VI.   Conclusion

Shippers and ABR are granted leave to amend.  The cross-motions for summary judgment on the plaintiffs' breach of contract claim are denied.  Shippers and ABR are entitled to summary judgment on the plaintiffs' negligence *per se* claim.  ABR is entitled to summary judgment on the plaintiffs' claims for breach of bailment contract and implied warranty, and claims based on *res ipsa loquitur*.

The plaintiffs' motion to exclude Arredondo's testimony is granted in part and denied in part. ABR's motion to exclude Matta's testimony is denied, and ABR's motion to exclude Simpkins's testimony is granted in part and denied in part.  ABR's motion to compel documents is granted in part and denied in part.  ABR's motions to compel the depositions of Glazier and Andy Cukurs are denied.

SIGNED on January 27, 2009, at Houston, Texas.

_____

Lee H. Rosenthal
United States District Judge

66